**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Thomas S. ROSS and John Collori,**
**Defendants–Appellants.**

**Nos. 92–1449 & 92–1685.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 18, 1995.

Decided Feb. 2, 1996.

Deborah A. Devaney (argued), Office of the United States Attorney, Criminal Division, Chicago, IL, Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for United States.

Thomas S. Ross (argued), Highland Park, IL, pro se.

Standish E. Willis (argued), Chicago, IL, for John Collori.

Before FLAUM, KANNE, and ROVNER, Circuit Judges.

KANNE, Circuit Judge.

Thomas Ross and his brother, John Collori, profited by defrauding financially needy students in search of an education and the federal government aid programs that attempted to give them one. As officers of the Illinois School of Commerce, which Ross owned and Collori worked for, the defendants engaged in a complicated scheme to receive undeserved federal financial aid funds and student loan monies, use these funds for their own personal benefit, refuse to refund these monies to the government and the students that were entitled to them, and repeatedly falsify records and financial documents to conceal their wrongdoing. To further their scheme, the defendants made false statements to auditing accountants, Department of Education investigators, and financial institutions. And in the end, after the school had gone bankrupt, Ross violated his fiduciary duty to the school's creditors (including the victims of their scheme) by improperly transferring school assets to himself and one of his friends. After a jury trial, Ross and Collori were convicted of several crimes, including mail and wire fraud, false statements, misapplication and embezzlement, and bankruptcy fraud. On appeal, the defendants raise a flood of arguments. Between them, they challenge the timeliness of the indictment, the jury instructions, the sufficiency of the evidence upon which they were convicted, and the calculation of their sentences. We affirm their convictions and sentences in all respects.

## I. History

In 1977, defendant Thomas Ross founded the Illinois School of Commerce ("ISC"), a for-profit business school located in downtown Chicago. For the next eleven years until the school's closing, Ross acted as ISC's president and sole shareholder. Ross's brother, defendant John Collori, joined ISC in December 1981 and served as the school's vice president of business services until he left for a brief period in May 1984. Collori returned to ISC in October 1985 and acted as the school's chief financial officer until it closed in May 1988.

In April 1982, ISC entered into a Program Participation Agreement with the Department of Education ("DOE"), allowing ISC to participate in Title IV student financial aid programs. The school was authorized to act as a "disbursing agent" for the federally funded Pell Grant program and to receive student loan checks as part of the federally insured and subsidized Guaranteed Student Loan ("GSL") program. Continued participation in these programs was contingent upon ISC's compliance with applicable DOE regulations and upon accreditation by an approved accrediting association, ISC was accredited by the Association of Independent Colleges and Schools ("AICS").

A short note on program mechanics. The Pell Grant program provided educational grants of approximately $2,000 per year to needy ISC students. ISC was required to submit cash request forms to the DOE for monies needed to fund student enrollments for the thirty days following submission of

the form. Based on these requests, the DOE would transfer funds from the United States Treasury to ISC's cash control account, where the school was to hold the funds in trust for the federal government. When qualifying students enrolled and completed their financial aid applications, the school was authorized to transfer corresponding cash control account monies into the school's operating account to pay the students' tuition debts. ISC utilized a system wherein the school officers filled out vouchers to document the number of eligible students with completed financial aid applications, so as to prevent excess transfers out of the cash control account. When a student would withdraw from school, ISC was required to refund the unused portion of grant monies to the cash control account. ISC was to offset any extra monies in the cash control account—either excess cash requests or refunds for withdrawn students—against future cash requests. To monitor the use of Pell Grant monies, the DOE required schools like ISC to file quarterly cash transaction reports. These reports were intended to reflect the quarterly amount of Pell Grant monies transferred to the operating account for student tuition debts, as well as the balance in the cash control account at the end of the quarter.

Unlike Pell Grants, loans under the GSL program were not made out of federal government funds. Instead, the loans were offered by banks and other financial institutions. The federal government's role was to administer the program, to guarantee that the loans were paid (thus assuring an exceptionally low interest rate), and in many cases to subsidize the loans by making interest payments during the time when the student debtors were still enrolled in school. After a qualifying student completed his application, the lending institution would send a loan check directly to ISC. The check would be made payable jointly to ISC and the recipient student, and both signatures were necessary to cash the check. Once cashed, the check would be deposited directly into the operating account and used to cover the student's tuition debt. When a student withdrew from school or had a credit balance, DOE regulations instructed that the school

was to refund the money to the student within standards set by the school's accrediting agency. In order to maintain accreditation, AICS required GSL refunds to be paid within thirty days. These refunds were particularly important because even if ISC failed to properly refund loan monies, the student debtor would nonetheless remain fully liable for the total amount of the loan.

ISC catered primarily to low-income students who qualified for federal financial aid funds. In fact, an estimated 99 percent of ISC's tuition payments were received through the Pell Grant and GSL programs, and only one in every two hundred ISC students was able to attend without financial aid. The nature of this student population allowed an extraordinary amount of federal financial aid funds to enter into ISC's accounts, and by 1987, when the school filed for bankruptcy, Ross and Collori had misappropriated over $1.4 million owed to students and the DOE.

Soon after ISC became eligible to participate in the federal financial aid programs, Ross and Collori commenced a pattern of abusing the Pell Grant program in order to improperly funnel excess government funds into the school and to conceal the fact that they were doing so. In order to bring in extra funds, both Ross and Collori filed numerous monthly cash request forms with the DOE that grossly overestimated ISC's projected Pell Grant needs by understating cash on hand levels. Although junior ISC employees informed the defendants of the cash control account's growing excess balance, the defendants ignored these figures and filed the request forms with inflated cash requirements they had derived out of whole cloth.

The excess money did not merely remain in the cash control account, however. Ross repeatedly directed that monies be transferred out of the cash control account without supporting student enrollment vouchers, many times for his own personal expenses. By June 1984, ISC had appropriated $594,-000 more in Pell Grant money than was justified by student enrollment. Yet despite this excess, Ross submitted cash request forms to draw down another $555,000 from

the Treasury in October and November of 1984.

In order to conceal the excess transfers out of the cash control account from both periodic auditors and the DOE, Ross directed ISC personnel to backdate several student enrollment vouchers, making it appear that the withdrawals had been justified. Ross and Collori also caused the quarterly cash transaction reports filed with the DOE to be falsified. Unlike the cash request forms, the transaction reports would *over*state the balance in the cash control account, masking the improper withdrawals from the cash control account.

In October 1985, DOE Special Agent Rex Livengood conducted an inspection of ISC's participation in the Pell Grant program and was given a spreadsheet purporting to track the activity in the cash control account for the year ending June 1985. In reality, Ross had directed that the spreadsheet be altered to conceal improper withdrawals and an excess balance. In 1986, when ISC Financial Aid Director Michael Shields once approached Collori about the incorrect cash control account figures listed on a transaction report, Collori told him: "There are things that you don't need to know, Michael. Don't worry. I'm protecting you from this. I don't want you to be involved in it." When the school closed in 1987, it was $552,000 overdrawn on Pell Grant money.

The defendants similarly abused the GSL program. ISC consistently failed to pay refunds, except to those students who complained the loudest. In 1984, AICS became concerned about ISC's failure to pay refunds and ordered an outside audit. Ross retained the accounting firm of Miller, Cooper to perform the audit, but he made several false representations concerning refund and tax debts during the audit. On the basis of the false information, Miller, Cooper issued an opinion letter to AICS certifying ISC's financial statements. However, when Miller, Cooper learned of Ross's falsities, they withdrew their opinion letter. To conceal the problem, Ross ordered Miller, Cooper not to turn over any work papers to the DOE. He then hired another accountant, J.V. Springman, to review the false financial statements. Relying on Ross's falsities, Springman issued a comfort letter, which Ross forwarded directly to AICS. Ross then sent AICS financial statements for 1984–85 that had been falsified to conceal refund and tax debts. In 1986, Ross and Collori performed a "recalculation" of withdrawn students' accounts, changing withdrawal dates to be more recent in order to conceal refund liability. In 1987, outside accountant Robert Weaver performed a required periodic audit. Collori lied and assured Weaver that all refunds had been timely paid during 1986–87, even though the school's records evidenced over $885,000 in outstanding refunds due at that time. Collori attempted to delay the discovery of his lie to Weaver by ordering a staff member to mix up student records before producing them for inspection.

As ISC's refund arrearage grew, Ross and Collori became more aggressive in their attempts to funnel excess loan money into the school. They instituted a program whereby withdrawn students that owed the school any money whatsoever were offered $100 to sign their entire GSL checks over to the school. For instance, one student that owed $35 received $100 in exchange for endorsing her $1,246 loan check to ISC—a loan she remained fully liable for. When the school finally closed, DOE officials estimated ISC's refund arrearage to be between $885,597 and $938,178, depending on the method of calculation.

During this entire financial shell game, Ross and Collori were appropriating funds for their own personal use. Ross made a downpayment on a yacht with $45,000 traceable to the Pell Grant cash control account. As ISC's sole shareholder, Ross authorized the school to make him a $1 million "loan." Much of the loan was spent on a failed attempt to launch an ISC campus in California; the rest was used for yacht loan payments and for $46,000 of home furnishings. In addition to these expenditures, Ross used $261,000 of ISC's money for commodities trading, $48,000 for limousine expenses, and $45,000 for a downpayment on a Mercedes. Ross also took $800,000 in bonuses in order to reduce the balance of his $1 million loan from ISC. It is difficult to see these

amounts as equity profit disbursements, given the school's growing refund arrearages at the time. Collori received more than $300,000 from ISC, in the form of a salary, fees for acting as a consultant, and even company payments of his child support obligations. Many of these payments were made during the period when Collori was not actually working at the school.

In 1986, Ross refinanced his yacht loan with the Harris Bank, a federally insured institution. On the application and his personal financial statement, he failed to disclose that he owed $749,000 to ISC. Ross also submitted ISC financial statements to Harris Bank, but altered them to conceal his identity as the school's primary debtor. Relying on this misinformation, Harris Bank gave Ross the refinancing for his yacht loan and suffered a $37,000 loss when Ross later defaulted.

On July 13, 1987, Collori and Ross could no longer bail water rapidly enough to keep the school afloat, and ISC filed for bankruptcy reorganization under Chapter 11. Yet in violation of his fiduciary duty to the creditors as an officer of the debtor, Ross began secretly paying money from the bankrupt school to himself and one of his friends. These payments were made both directly and as purported payment for nonexistent services provided by shell corporations.

After a criminal investigation and two initial indictments, Ross and Collori were charged in a third superseding indictment on May 29, 1991. For their scheme to defraud the federal government and the students of ISC, they were each charged with several counts of mail fraud, wire fraud, making false statements regarding a matter within the jurisdiction of the DOE, and knowingly and willfully misapplying federal financial aid funds. In addition, Ross was charged with two counts of making false statements to a federally insured institution and with three counts of bankruptcy fraud.

After a trial, the jury convicted both defendants on all counts. The district court sentenced Ross to sixty months for all guidelines counts, two years concurrently on the remaining nonguidelines counts, and three years of supervised release. Collori was sentenced to fifty-two months on the guidelines counts, two years concurrently on the remaining nonguidelines counts, and three years of supervised release. Further, Ross and Collori were made jointly and severally liable for paying restitution in the amount of $1,000,100. Both defendants appeal their convictions and the calculation of their sentences.

## II. ANALYSIS

### A. Statute of Limitations

Ross argues initially that the government's third superseding indictment, issued on May 29, 1991, was time barred because it was not brought within the five-year limitation period prescribed by 18 U.S.C. § 3282. Ross did not, however, raise this argument before the district court. Although the advisory committee note to FED. R.CRIM.P. 12(b) explains that failure to raise a statute of limitations argument in a *pretrial* motion will not result in waiver, it does not follow that a defendant is free to wait until appeal to first assert his objection. Statutes of limitation are not a jurisdictional bar to prosecution; they are an affirmative defense that must be raised by the defendant. *United States v. Meeker,* 701 F.2d 685, 687 (7th Cir.), *cert. denied,* 464 U.S. 826, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983). And it is widely accepted that a statute of limitations defense is forfeited if not raised at the trial itself. *See, United States v. O'Bryant,* 998 F.2d 21, 23 n. 1 (1st Cir.1993); *United States v. Walsh,* 700 F.2d 846, 855 (2d Cir.), *cert. denied,* 464 U.S. 825, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983); *United States v. Karlin,* 785 F.2d 90, 92–93 (3d Cir.1986), *cert. denied,* 480 U.S. 907, 107 S.Ct. 1351, 94 L.Ed.2d 522 (1987); *United States v. Williams,* 684 F.2d 296, 299 (4th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 961 (1983); *United States v. Arky,* 938 F.2d 579, 581–82 (5th Cir.1991), *cert. denied,* 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); *United States v. LeMaux,* 994 F.2d 684 (9th Cir. 1993); *United States v. Gallup,* 812 F.2d 1271, 1280 (10th Cir.1987); *United States v. Wild,* 551 F.2d 418, 424–25 (D.C.Cir.), *cert. denied,* 431 U.S. 916, 97 S.Ct. 2178, 53

L.Ed.2d 226 (1977). *See also* 1 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 193 (2d ed. 1982 & Supp.1995).

As a result, we review Ross's argument only for plain error.[1] FED.R.CRIM.P. 52(b). But of course plain error cannot be found where there is no error at all, *United States v. Olano*, 507 U.S. 725, 732–34, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993), and here Ross's argument fails on the merits.

The Supreme Court has explained that statutes of limitation are "mechanisms to guard against possible ... prejudice resulting from the passage of time between crime and arrest or charge." *United States v. Marion*, 404 U.S. 307, 322, 92 S.Ct. 455, 464, 30 L.Ed.2d 468 (1971). They are "designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past." *Toussie v. United States*, 397 U.S. 112, 114–15, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970). However, once an indictment has been timely filed, the defendant is notified of the charge against him and may begin to prepare his defense. The mere restatement or superficial amendment of the charge in a subsequent indictment does not further prejudice the defendant and thus does not offend the purposes underlying the limitation period. Therefore, a superseding indictment that supplants a still-pending original indictment relates back to the original indictment's filing date so long as it neither materially broadens nor substantially amends the charges initially brought against the defendant. *See O'Bryant*, 998 F.2d at 23–24; *United States v. Robilotto*, 828 F.2d 940, 949 (2d Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988); *United States v. Friedman*, 649 F.2d 199,

203–04 (3d Cir.1981); *United States v. Snowden*, 770 F.2d 393, 398 (4th Cir.1985); *United States v. Schmick*, 904 F.2d 936, 940 (5th Cir.1990), *cert. denied*, 498 U.S. 1067, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991); *United States v. Lash*, 937 F.2d 1077, 1081 (6th Cir.1991); *United States v. Pacheco*, 912 F.2d 297, 305 (9th Cir.1990); *United States v. Davis*, 953 F.2d 1482, 1491 (10th Cir.), *cert. denied*, 504 U.S. 945, 112 S.Ct. 2286, 119 L.Ed.2d 210 (1992); *United States v. Italiano*, 894 F.2d 1280, 1282 (11th Cir.), *cert. denied*, 498 U.S. 896, 111 S.Ct. 246, 112 L.Ed.2d 205 (1990).

When the third superseding indictment was returned against Ross on May 29, 1991, twenty of the indictment's thirty-five counts were still within the five-year limitation period. Regardless of any relation back, these charges clearly were not time barred.

As to the fifteen counts that were beyond the limitation period (counts 7, 10, 11, 17–21, and 25–31), each had been timely handed down in either the original or the (first) superseding indictment and realleged in the second superseding indictment, which was pending at the time the third superseding indictment was filed. As explained above, these counts relate back to their original timely filing date so long as they neither materially broadened nor substantially amended the counts in the earlier indictments. They did neither. Ten of these fifteen counts (7, 10, 11, and 25–31) were identical in every respect to how they had appeared when they were first entered, and so were not broadened or amended at all. The five that were changed (counts 17–21) had been modified in only two minor respects: (1) reference to a specific Code of Federal Regulations provision had been deleted and replaced with the general words "federal regulations" to obviate confusion from a change in the regulations' number-

---

1. In his Reply Brief, Ross argues that plain error analysis is inappropriate and that we should instead consider his argument on the merits. He cites to *United States v. O'Bryant*, where the court noted: "Appellant raises this claim for the first time on appeal. We would, therefore, ordinarily review it only for plain error.... But, because we find that the claim is unavailing as a matter of law, we forgo the extra step that plain-error review entails and proceed directly to the merits." 998 F.2d at 23 n. 1. Contrary to Ross's assertions, the court in *O'Bryant* was not saying that reviewing an unpreserved statute of limitations objection for plain error is "unavailing as a matter of law." Rather, as in this case, the court determined that plain error analysis was unnecessary because the defendant had failed to demonstrate *any* violation of the statute of limitations, plain or otherwise, and thus his objection failed on the merits.

ing; and (2) the time period in which the conduct forming the basis of each count was alleged to have occurred was narrowed by one month. The first of these alterations was simply cosmetic; the second actually narrowed, rather than broadened, the time frame of the charge against the defendant. Neither of these superficial changes amounts to the kind of broadening or amendment that would prevent relation back to an earlier pending indictment. As a result, these fifteen counts relate back to their previous timely filings and, like the twenty timely counts, were not barred by the statute of limitations.

## B. Jury Instructions

 Ross makes several objections to the district court's jury instructions, all for the first time on appeal. FED.R.CRIM.P. 30 states that "[n]o party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." Thus, when a defendant fails to object to jury instructions at trial, he has forfeited his right to assign error to those instructions on appeal, and we may review his arguments only for plain error. *United States v. Cheek,* 3 F.3d 1057, 1060 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1055, 127 L.Ed.2d 376 (1994); *United States v. Windsor,* 981 F.2d 943, 946 (7th Cir.1992); *United States v. Stodola,* 953 F.2d 266, 272 (7th Cir.), *cert. denied,* 506 U.S. 834, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992). Under this exacting standard, we have no power to reverse unless the defendant first demonstrates that (1) there was error; (2) the error was plain; and (3) the error affected the defendant's substantial rights. *Olano,* 507 U.S. at 732–35, 113 S.Ct. at 1777–78. Once the defendant has established these three requirements, we have the authority to correct the error, but we are not required to do so. *Id.* at 735–36, 113 S.Ct. at 1778. We will not reverse unless, in our discretion, we find the error seriously affects the fairness, integrity, or public reputation of

judicial proceedings. *Id.* at 736–37, 113 S.Ct. at 1779.

### 1. *Character Evidence*

 Ross argues that the district court erred in failing to instruct the jury that any witness's testimony about his good character would be sufficient, on its own, to create a reasonable doubt as to his guilt. However, this court has repeatedly held that such an instruction, while sometimes allowable, is never necessary. *See, e.g., United States v. Harrington,* 919 F.2d 449, 450 (7th Cir.1990); *United States v. Burke,* 781 F.2d 1234, 1239 (7th Cir.1985). Thus, Ross's argument falters on the first hurdle of the plain error inquiry because he has failed to demonstrate any error at all.

### 2. *Materiality*

 In counts 7 and 10–15, Ross was charged with several instances of making false statements concerning matters within the jurisdiction of the DOE, in violation of 18 U.S.C. § 1001. As an element of this offense, the government was required to prove that Ross's untrue statements were "material." *United States v. Brantley,* 786 F.2d 1322, 1326 (7th Cir.), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986). Ross contends that the district court erred by instructing the jury that "materiality" is an issue of law.

At the time of trial, it was well settled in this circuit, as well as in most other circuits,[2] that a false statement's materiality is a question of law to be decided by the court rather than the jury. *See, e.g., United States v. Lesperance,* 25 F.3d 553, 557 (7th Cir.1994); *Moser v. United States,* 18 F.3d 469, 473 (7th Cir.1994); *United States v. Bullock,* 857 F.2d 367, 370–71 (7th Cir.1988). Adhering to this precedent, the district court did not submit the question of materiality to the jury, but instead determined itself that the statements charged were "material" and instructed the jury to consider the element of materiality to be established as a matter of law.

---

**2.** *See United States v. Gaudin,* 28 F.3d 943, 955 (9th Cir.1994) (Kozinski, J., dissenting) (collecting cases).

Since the time of trial, however, the Supreme Court has decided that the Sixth Amendment guarantees a criminal defendant's right to have a jury decide each and every element of the offense with which he is charged, including the issue of materiality. *United States v. Gaudin*, —— U.S. ——, ——, 115 S.Ct. 2310, 2320, 132 L.Ed.2d 444 (1995). This holding effectively overturned the settled precedent on which the district court relied in giving its instruction. Thus, Ross has satisfied the first requirement of plain error analysis by demonstrating that the district court committed an error, some deviation from a legal rule. *See Olano*, 507 U.S. at 732–34, 113 S.Ct. at 1777.

■ The second requirement of plain error analysis is that the district court's error be "plain," which is synonymous with "clear" or "obvious." *Id.* The Supreme Court explained in *Olano* that this requirement, at a minimum, prevents us from reversing for plain error unless the district court's error is clear under current law, i.e., the law at the time of appellate review. *Id.* After *Gaudin*, the district court's error here is certainly clear under current law. However, the Supreme Court declined to address the special situation we have before us today: "where the error was unclear at the time of trial but becomes clear on appeal because the applicable law has been clarified." *Olano*, 507 U.S. at 734, 113 S.Ct. at 1777. We must decide whether "plain" should be interpreted as requiring the defendant to show that the district court's error was clear at the time of trial or merely at the time of appeal.

The rule that an objection is forfeited if not raised at trial creates an incentive for defendants to raise objections where they may be most efficiently resolved—before the district court. Forfeiture respects the district courts' institutional competence for resolving questions that may often be heavily laden with factual issues, avoids squandering

judicial resources on numerous needless appeals, and prevents defendants from strategically withholding objections in order to assert them on appeal and obtain a new trial.

Plain error review creates a limited exception to the general forfeiture rule, in that where a district court's error shakes one's faith in the judicial process, an appellate court has the discretion to correct the error despite the defendant's failure to object at trial. The plain error rule is protective; it recognizes that in a criminal case, where a defendant's substantial personal rights are at stake, the rule of forfeiture should bend slightly if necessary to prevent a grave injustice.

■ Accordingly, the stringent requirements of plain error review (including "plainness") must not be viewed as a yardstick for measuring the magnitude of the district court's mistake (a view under which interpreting "plain" as clear at the time of trial makes a great deal of sense). To do so would illogically shift the focus of plain error review from whether the severity of the error's harm demands reversal to whether the district court's action simply deserves rebuke. Instead, the plain error requirements should be interpreted as means to cabin the appellate court's discretion and to safeguard against erosion of the rule of forfeiture. The requirements that an error be "plain" and that it "affect substantial rights" limit the authority of the appellate courts, preventing them from correcting forfeited errors that are either questionable or inconsequential. When viewed as a limitation on appellate court power to circumvent forfeiture where an error is debatable, rather than as a measure of district court fault, the "plainness" inquiry must look to the error's certainty from the perspective of the appellate court. Thus, we now hold that for purposes of Rule 52(b), a "plain" error is one that is clear and uncontroverted at the time of appeal.[3] Given

---

3. This holding accords with our plain error analysis in *United States v. Jones*, 21 F.3d 165, 172–73 (7th Cir.1994). Also, with this holding, we substantially agree with the decisions of every other circuit that has addressed this issue. *See United States v. Keys*, 67 F.3d 801, 809 (9th Cir.1995) (holding that for purposes of Rule 52(b), "plain" refers to the time of appeal); *Unit-*

*ed States v. Retos*, 25 F.3d 1220, 1230 (3d Cir. 1994) (same); *United States v. Washington*, 12 F.3d 1128, 1138–39 (D.C.Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 98, 130 L.Ed.2d 47 (1994) (holding that "plain" refers to the time of trial, but recognizing an exception where the law upon which the district court relied was so settled at the time of trial that an objection would seem

that the district court's error is unquestionable after *Gaudin*, Ross has satisfied his second burden under the plain error standard.

■ The third requirement of plain error analysis is that the error affected the defendant's "substantial rights." *Olano*, 507 U.S. at 734–35, 113 S.Ct. at 1777–78. The Supreme Court in *Olano* explained that this requirement calls for the same inquiry as "harmless error" analysis, except that here the defendant bears the burden of persuasion with respect to prejudice. *Id.* at 734–35, 113 S.Ct. at 1778. Harmless error inquiry in criminal cases is significantly more stringent than in civil cases. The hypothetical rational jury is irrelevant for appraising the prejudice of an error in a criminal jury trial. Harmless error analysis in the appeal of a criminal case asks "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) (emphasis in original). Ross must only prove the converse. He need not establish that in a trial without the error, a reasonable jury would have acquitted him; he must demonstrate that the jury verdict in this case was actually affected by the district court's faulty instruction.

■ Ross has no trouble making this showing. Materiality is an essential element of the false statement crimes with which Ross was charged. *Brantley*, 786 F.2d at 1326. But the issue of materiality was never submitted to the jury, and thus the jury necessarily relied on the district court's erro-

neous preemptive instruction when it found Ross guilty. This court has held that, in general, failure to submit an essential element of a criminal offense to the jury for determination cannot be harmless; it is necessarily prejudicial. *United States v. Shetterly*, 971 F.2d 67, 73 (7th Cir.1992); *United States v. Kerley*, 838 F.2d 932, 938 (7th Cir. 1988). Where a defendant demonstrates this prejudice, the third part of the plain error analysis is satisfied.

■ Thus, Ross has satisfied the prerequisites for plain error review by demonstrating that the district court erred, that the error is "plain," and that the error affected his "substantial rights." But exercise of the power to reverse under plain error review is permissive, not mandatory. The Supreme Court instructed in *Olano* that we should only reverse Ross's conviction if, in our discretion, we find that the district court's error seriously affects the fairness, integrity, and public reputation of judicial proceedings. 507 U.S. at 736–37, 113 S.Ct. at 1779. The Court further explained that merely because an error is "plain" and affects "substantial rights" does not, without more, satisfy this standard, else our discretion would be illusory. *Id.*

Here, the government presented evidence sufficient to convince any rational factfinder that the defendants' false statements were material. In fact, the issue of materiality was not even significantly disputed by the defendants at trial. Furthermore, the district court acted properly according to established precedent when it decided that the statements were material, rather than allowing the jury to come to the same obvious conclusion. It would be an unnecessary

pointless); *United States v. Viola*, 35 F.3d 37, 41–42 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995) (holding not only that "plain" refers to the time of appeal, but that where an objection at the time of trial would have been pointless, the government, rather than the defendant, bears the burden of proving prejudice under plain error review). The only court of appeals to indicate differently did not specifically address the issue. *United States v. Calverley*, 37 F.3d 160, 162–63 (5th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1266, 131 L.Ed.2d 145 (1995). Rather, in passing reference, the court interpreted the language in *Olano* that "[a]t a minimum, the Court of Appeals can-

not correct an error pursuant to Rule 52(b) unless the error is clear under current law" to mean that a "plain" error must be clear at the time of trial. Thus, the *Calverley* Court concluded that the Supreme Court had already decided the issue. This conclusion seems mistaken, however, because in the preceding sentence the *Olano* Court expressly declined to address the specific question of whether "plain" means clear at the time of trial. This indicates that in the passage cited in *Calverley* the Court used "current law" to refer to the law at the time of appeal, not the time of trial and thereby left unresolved the question we decide today.

waste of judicial resources to retry this case based on the district court's failure to submit overwhelming evidence of a barely disputed issue to the jury, especially given that the district court was following settled law at the time. As a result, we do not find that the district court's error brings into question the fairness, integrity, or reputation of judicial proceedings, and we decline the invitation to grant Ross a new trial.

### 3. *Misapplication*

■ On counts 16–29, Ross was convicted of violating 20 U.S.C. § 1097(a), which at the time of trial provided:

> Any person who knowingly and willfully embezzles, misapplies, steals, or obtains by fraud, false statement, or forgery any funds, assets, or property provided or insured under this [title] shall be fined not more than $10,000 or imprisoned for not more than 5 years, or both; but if the amount ... does not exceed $200, the fine shall not be more than $1,000 and imprisonment shall not exceed one year, or both.

Ross contends that the district court's jury instructions on these counts constituted error in two ways, neither of which has merit.

First, Ross argues that the instructions directed the jury that it could convict him for "fraud" and "false pretenses" when that language did not appear in the indictment. But Ross does not identify, and we cannot locate, the allegedly faulty instructions. For each and every count of misapplication and embezzlement, the language of the district court's instructions perfectly tracked the language of the indictment, and nowhere did the words "fraud" or "false pretenses" ever appear. Neither did the court mention "fraud" or "false pretenses" when it defined "misapply" and "embezzle" in the instructions. Thus, there is no support whatsoever for Ross's argument.

Ross argues secondly that the instructions for counts 16–24, by reference to the indictment, directed the jury that it could convict him for "failure to make refunds" when that language was not added to § 1097(a) until long after Ross had been tried and convicted. Ross is correct that explicit language concerning the failure to refund federally in-

sured funds was only added to § 1097(a) when the statute was amended in July of 1992 and that Ross's trial took place in 1991. However, failing to make refunds constituted misapplication within the meaning of § 1097(a) even prior to its amendment. As the legislative history of the 1992 amendment explains: "The conferees wish to emphasize that failure to pay refunds does constitute criminal misapplication under current law. Language is added in this bill merely as a clarification." H.R.Conf.Rep. No. 630, 102d Cong., 2d Sess. 513, *reprinted in* 1992 U.S.C.C.A.N. 628. Thus, the district court's directions that failure to properly refund federally insured monies can constitute misapplication were proper.

### 4. *The DOE Regulatory Scheme*

■ At trial, Ross had offered to introduce into evidence a five-hundred-page exhibit setting out the text of applicable (as well as irrelevant) regulatory provisions. Some of the regulations detailed in the exhibit had been enacted after the period of Ross's alleged wrongdoing, and several of the regulations' reference numbers had changed over time. In light of the adequate testimonial evidence at trial concerning the regulations' relevant content, the district court in its discretion refused to admit the exhibit, reasoning that it would only confuse the jurors and would not aid in their understanding of the regulations.

Ross does not appeal this evidentiary ruling. Instead, Ross argues that the district court erred "when it refused to instruct the jury as to the regulatory scheme, in its entirety." The district court, however, never refused to give such an exhaustive instruction because Ross never requested one. In fact, Ross actually submitted a limited request that the jury be instructed about only certain specific regulatory provisions, and the district court gave his requested instructions.

■ The Supreme Court has explained that "forfeiture" is the failure to make a timely assertion of a right, while "waiver" is the intentional relinquishment or abandonment of a known right. *Olano*, 507 U.S. at 733, 113 S.Ct. at 1777. Plain error

analysis may be invoked to review a forfeited objection because mere forfeiture does not extinguish an "error" under FED.R.CRIM.P. 52(b). *Id.* Where there has been a valid waiver, however, plain error analysis does not apply because there is technically no "error" to correct. *Id.* Here Ross actually proposed (and thereby implicitly approved) the district court's instructions concerning the DOE regulatory scheme, rather than merely failing to object to them. As a result, he has voluntarily waived any objection that he might have to these instructions, and we will not review his argument even for plain error. *Id.; United States v. Espino,* 32 F.3d 253, 258–59 & n. 5 (7th Cir.1994); *United States v. Lakich,* 23 F.3d 1203, 1207–08 (7th Cir.1994).

## C. Sufficiency of the Evidence

▮▮▮▮▮ Ross and Collori each proffer numerous arguments that the evidence presented at trial was insufficient to convict them of the crimes with which they were charged. When reviewing a conviction for sufficiency of the evidence, our role is limited. It is not our function to reweigh the evidence, nor to substitute our judgment for that of the factfinder. *United States v. Hatchett,* 31 F.3d 1411, 1416 (7th Cir.1994). We consider the evidence in the light most favorable to the prosecution, making all reasonable inferences in its favor, and will affirm the conviction so long as any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Reversal is warranted "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *United States v. Garcia,* 35 F.3d 1125, 1128 (7th Cir.1994) (quoting *United States v. Gutierrez,* 978 F.2d 1463, 1468–69 (7th Cir.1992)).

### 1. *Mail and Wire Fraud (counts 1–6, 8–9)*

▮▮▮▮ In order to convict for mail fraud under 18 U.S.C. § 1341, or for wire fraud under 18 U.S.C. § 1343, the government must demonstrate: (1) the defendants' participation in a scheme to defraud; (2) the defendants' intent to defraud; and (3) the defendants' use of the mails or wires in furtherance of the fraudulent scheme. *United States v. Walker,* 9 F.3d 1245, 1249 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1863, 128 L.Ed.2d 485 (1994) (mail fraud); *United States v. LeDonne,* 21 F.3d 1418, 1429 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 584, 130 L.Ed.2d 498 (1994) (wire fraud); *Lombardo v. United States,* 865 F.2d 155, 157 (7th Cir.), *cert. denied,* 491 U.S. 905, 109 S.Ct. 3186, 105 L.Ed.2d 695 (1989) (same).

▮▮▮ Ross offers two arguments that the government failed to prove the first element of mail and wire fraud, his participation in a scheme to defraud. First, Ross asserts that the mail and wire fraud statutes do not encompass prosecution of a scheme to defraud the United States itself. In practice, however, the mail and wire fraud statutes are routinely utilized to punish schemes to defraud the federal government of a property interest. *See, e.g., United States v. Morris,* 957 F.2d 1391 (7th Cir.), *cert. denied,* 506 U.S. 941, 113 S.Ct. 380, 121 L.Ed.2d 290 (1992); *United States v. Jones,* 938 F.2d 737 (7th Cir.1991); *United States v. Johnson,* 927 F.2d 999 (7th Cir.1991); *United States v. Bucey,* 876 F.2d 1297 (7th Cir.), *cert. denied,* 493 U.S. 1004, 110 S.Ct. 565, 107 L.Ed.2d 560 (1989).

▮▮▮ Secondly, Ross argues that there was no evidence of a scheme to defraud because all the evidence adduced at trial had been developed through criminal investigations rather than through a "federal civil audit." To support his assertion, Ross points to 20 U.S.C. § 1094, which specifies the procedures that the DOE must follow before suspending or revoking an institution's participation in a financial aid program. This court has explained that § 1094 mandates an audit and a hearing on the record whenever the DOE seeks to revoke program eligibility of an institution that has previously been deemed eligible in all other respects. *Continental Training Services, Inc. v. Cavazos,* 893 F.2d 877, 883 (7th Cir.1990). A criminal investigation is insufficient to satisfy the civil audit and hearing requirements of § 1094

because such investigations rarely involve notice and a hearing. *See Tangipahoa Parish School Bd. v. United States Dep't of Educ.,* 821 F.2d 1022, 1029 (5th Cir.1987). However, § 1094 merely establishes the notice and hearing requirements that the DOE must satisfy prior to revoking program *eligibility* or imposing other *civil* penalties. These requirements are necessary, for without them the participating institutions would be denied their right to due process. Section 1094 does not apply to *criminal* actions because in that context it is unnecessary. In a criminal case, the due process requirements of notice and a hearing are accomplished by the indictment and the trial. Ross has been afforded every opportunity to cross-examine and refute the government's evidence, and it would be ludicrous to maintain that a criminal trial could not be brought with evidence from a criminal investigation. Ross's argument that he may be convicted only on evidence from a "federal civil audit" has no merit.

 Collori puts forth two arguments that the prosecution did not prove his intent to defraud. First, he maintains that he did not benefit in the "fruits of the crime." However, the government did, in fact, offer evidence that Collori had profited from the scheme. Evidence was introduced that during the period of fraudulent activity, Collori received more than $300,000 in the form of salary, consulting fees, and company payments of his child support obligations. The evidence demonstrated that many of these payments were made at times when Collori was not even working at the school. Collori argues that these payments were merely usual compensation for his employment and do not represent illicit profits. Yet, viewing the evidence in the light most favorable to the government and making all reasonable inferences in its favor, a rational trier of fact could have found that Collori was being compensated for his intentional participation in the fraudulent scheme. Even were that not the case, this circuit has held that a showing of personal benefit is not required to demonstrate intent to defraud. *United States v. Cosentino,* 869 F.2d 301, 308 (7th Cir.), *cert. denied,* 492 U.S. 908, 109 S.Ct. 3220, 106 L.Ed.2d 570 (1989). It is enough that the defendant intended to cause actual or poten-

tial loss to the victims of the fraud, whether to enrich himself, another, or no one. *See United States v. Moede,* 48 F.3d 238, 242 (7th Cir.1995).

 Second, Collori argues that his actions do not manifest an intent to defraud because they fell within the normal performance of his duties as chief financial officer. An intent to defraud may be established by circumstantial evidence and by inferences from the facts and circumstances surrounding the scheme. *LeDonne,* 21 F.3d at 1429. At trial, the government introduced evidence that Collori deliberately falsified cash request forms, which resulted in excessive drawdowns of Pell Grant funds from the Treasury; that he directed vouchers to be backdated so as to create the appearance that the school disbursed more Pell Grants to students than it actually did; that he falsified cash transaction reports submitted to the DOE in order to overstate cash holdings; that he fraudulently recalculated refund amounts in anticipation of an AICS evaluation; that he lied to DOE auditor Robert Weaver; that he ordered the office manager to disarrange student files that were to be produced to an outside agency; that he received over $300,000 in compensation during the time period of the fraudulent scheme, some of it when he was not even working; and that he told Michael Shields: "There are things that you don't need to know, Michael. Don't worry. I'm protecting you from this. I don't want you to be involved in it." Although Collori attempts to offer an explanation for how all these acts either did not occur or were legitimate, our review does not amount to a reweighing of the evidence. When the evidence presented at trial is viewed in the light most favorable to the government, clearly a rational jury could have found Collori's intent to defraud beyond a reasonable doubt.

2. *False Statements (counts 7, 10–11 (Ross only) and 12–15 (both Ross and Collori))*

 In order to convict a defendant of making false statements in violation of 18 U.S.C. § 1001, the government must prove:

(1) that the defendant made a statement (or that the defendant concealed facts that he had a duty to disclose); (2) that the statement was false; (3) that the statement was material; (4) that the statement was made knowingly and willfully; and (5) that the statement concerned a matter within the jurisdiction of a federal department or agency. *Brantley,* 786 F.2d at 1326; *United States v. Petullo,* 709 F.2d 1178, 1180 (7th Cir.1983).

Collori argues only that the government failed to prove his intend to defraud. However, as discussed above in our treatment of the mail and wire fraud counts, the record contains ample evidence from which a reasonable jury could have found Collori's intent to defraud beyond a reasonable doubt.

Ross's contentions are more numerous, yet no more compelling. Ross was charged with making essentially three different types of false statements, and he offers specific arguments for each of the types.

In the first category, charged in counts 7 and 10, Ross was accused of making false statements to AICS. Count 7 concerned Ross's sending of the Springman comfort letter to AICS in order to conceal Miller, Cooper's withdrawal of its opinion letter. Count 10 addressed Ross's subsequent submission to AICS of a falsified financial statement. Ross raises two challenges to the sufficiency of the government's evidence on these counts.

 First, Ross argues that his statements to AICS did not concern a matter within the jurisdiction of the DOE because their submission was not required by a federal statute and because they were not submitted directly to a federal department or agency (AICS was a private accrediting association). Ross cites to the Supreme Court's language in *Bryson v. United States* that "[a] statutory basis for an agency's request for information provides jurisdiction enough to punish fraudulent statements under § 1001." 396 U.S. 64, 70–71, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969). But the *Bryson* holding provides little support for Ross's argument. In *Bryson,* the Court faced the issue of whether false statements in a statutorily mandated disclosure can constitute a violation of § 1001 even if the disclosure statute

is later determined to be constitutionally invalid. The Court held that a statute (even an invalid one) requiring disclosure was *sufficient,* not necessary, for the application of § 1001. *Id.* The Court's holding does not limit the application of § 1001 to false statements submitted directly to a department or agency, nor to disclosures that are statutorily mandated. In fact, the *Bryson* Court directed that " 'jurisdiction' should not be given a narrow or technical meaning for purposes of § 1001." *Id.* This court has held that "[t]he term 'jurisdiction' merely incorporates Congress' intent that the statute apply whenever false statements would result in the perversion of the authorized functions of a federal department or agency." *United States v. Stanford,* 589 F.2d 285, 297 (7th Cir.1978).

 Contrary to Ross's argument, the law is clear that for a statement to concern a matter within the jurisdiction of a federal department or agency, it need not be submitted directly to that federal department or agency. *United States v. Brack,* 747 F.2d 1142, 1151 (7th Cir.1984), *cert. denied,* 469 U.S. 1216, 105 S.Ct. 1193, 84 L.Ed.2d 339 (1985); *Petullo,* 709 F.2d at 1180. *See also United States v. Davis,* 8 F.3d 923, 929 (2d Cir.1993); *United States v. Wright,* 988 F.2d 1036, 1038 (10th Cir.1993); *United States v. Herring,* 916 F.2d 1543, 1547 (11th Cir.1990), *cert. denied,* 500 U.S. 946, 111 S.Ct. 2248, 114 L.Ed.2d 488 (1991); *United States v. Popow,* 821 F.2d 483, 486 (8th Cir.1987). For a statement to fall within a federal agency's jurisdiction, "it suffices to show that the deception of a private company affected a federal agency because of that agency's responsibility to ensure that its funds are properly spent." *Brack,* 747 F.2d at 1151.

This court has repeatedly found the submission of fraudulent statements to a private (or nonfederal government) entity to be within the jurisdiction of a federal agency where the agency has given funding to the entity and the fraudulent statements cause the entity to utilize these funds improperly. *Id.; United States v. Hamilton,* 726 F.2d 317, 321 (7th Cir.1984); *Petullo,* 709 F.2d at 1180; *Stanford,* 589 F.2d at 297–98. In these cases, the jurisdictional nexus between the

agency and the entity for purposes of § 1001 stems from the agency's ultimate duty to safeguard the proper spending of federal funds. Although the DOE's funds in this case did not pass through AICS on the way to ISC, this case presents a situation analogous to the cases cited above because of AICS's integral part in the DOE's decision making concerning the distribution of federal funds. Here, the administration of financial aid program disbursals falls squarely within the regulatory authority of the DOE. The DOE made program participation dependent upon accreditation by an association such as AICS, and as a result the DOE significantly relied upon these associations' audits and appraisals when making decisions about the disbursement of federal funds. Ross knew that the DOE based much of its program eligibility determinations upon the AICS accreditation, and he deliberately made false statements to the AICS for the express purpose of continuing ISC's eligibility for Pell Grant and GSL monies. We find this evidence clearly sufficient to demonstrate that Ross made false statements concerning a matter within the jurisdiction of the DOE.

▉▉▉▉▉ Secondly, Ross argues that the government failed to demonstrate that the Springman comfort letter and the false financial statements were material. A false statement is considered material where it has a natural tendency to influence, or is capable of influencing, the decision of the federal agency to which it is directed. *Gaudin*, —— U.S. at ——, 115 S.Ct. at 2313; *United States v. Malsom*, 779 F.2d 1228, 1235 (7th Cir.1985); *Brack*, 747 F.2d at 1147. The government adduced evidence that both the comfort letter and the false financial statements had the primary purpose and effect of lulling AICS into believing that ISC merited its continued accreditation. Given that AICS accreditation was a DOE prerequisite to financial aid program participation, the false statements had a natural tendency and capability of influencing the DOE's decision concerning ISC's eligibility. Clearly the government presented ample evidence from which a rational factfinder could find Ross's false statements to be material beyond a reasonable doubt.

▉▉ In the second category of false statement, charged in counts 12–15, Ross (as well as Collori) was convicted for causing false cash transaction reports to be filed with the DOE. These false reports overstated ISC's cash on hand, concealing the fact that ISC Pell Grant funds had been withdrawn and used improperly. Ross puts forth two arguments that the government failed to prove the cash transaction reports were false. First, Ross contends once again that there was no evidence of falsity because all evidence produced at trial had been procured through criminal investigations rather than from a "federal civil audit." As we explained above in conjunction with the scheme to defraud element of the mail and wire fraud counts, this argument has no merit. Secondly, Ross argues that the government's methodology for calculating cash on hand was incorrect. His argument is essentially that if one calculates the funds his way, rather than as the government did, the cash transaction reports were completely accurate. Again, however, it is not the function of this court to reweigh the evidence at trial. The government offered evidence that Ross had caused false cash request forms to be filed, with cash on hand stated at absurdly low levels, in order to receive larger amounts of Pell Grant funds from the DOE; that Ross had withdrawn Pell Grant funds for his personal use; and that Ross had caused student withdrawal vouchers to be backdated in order to conceal his own improper withdrawals. Given this evidence, a rational jury could certainly reject Ross's arguments concerning the methodology for calculating cash on hand and find that false cash transaction reports had been filed, with overstated cash-on-hand levels, in an attempt to further conceal the improper withdrawals.

In the third type of false statement, which was charged in count 11, Ross was convicted of causing the · altered cash reconciliation spreadsheet to be given to Special Agent Livengood during his inspection. For this count, Ross maintains that none of the four elements of § 1001 have been demonstrated. With respect to falsity and intent, Ross argues that, as with the cash transaction reports, the government's methodology for demonstrating the spreadsheet's falsity was

flawed. As a result, Ross insists the government proved neither that the spreadsheet was false nor that it was submitted with an intent to deceive the DOE. Once again, however, Ross mistakes the role of this court in reviewing for insufficiency of the evidence. It is enough that there was ample evidence for a rational jury to reject Ross's arguments at trial and agree with the government's assessments.

■■■■ Ross makes two arguments concerning the materiality of the false spreadsheet. First, he contends the false spreadsheet was not material because there existed no statutory duty to submit it. However, as this court has previously held, the fact "[t]hat a statement was not required to be made to the agency does not make the statement any less material." *United States v. Dick*, 744 F.2d 546, 553 (7th Cir.1984). Secondly, Ross argues that the spreadsheet was not material because neither Special Agent Livengood nor the DOE actually relied on it. Yet, "[u]nder section 1001 a false statement may be material even though the agency did not rely on it and was not influenced by it." *Id.* The government need only have proved that the spreadsheet submitted to Livengood had the natural tendency or capability to influence a decision of the DOE—a showing that was clearly made here.

Finally, Ross argues that the spreadsheet did not concern a matter within the jurisdiction of the DOE because ISC had no statutory duty to submit it. As we explained in connection with Ross's false statements to AICS, however, the application of § 1001 is not limited to false statements submitted directly to a department or agency, nor to disclosures that are statutorily mandated. There is ample evidence here that the spreadsheet concerned a matter within the official regulatory authority of the DOE.

3. *Misapplication and Embezzlement (counts 16–24 (both Ross and Collori) and 25–29 (Ross only))*

■■■■ Ross and Collori challenge their convictions for misapplication under 20 U.S.C.

§ 1097(a), first by asserting that conversion and intent to defraud are necessary elements of the offense, and second by insisting that the government failed to prove these elements. The issue of whether conversion and intent to defraud are elements of misapplication under § 1097(a) was not fully briefed by the parties,[4] and we decline to resolve it today. Because we find that the government has put forth ample evidence to establish both conversion and fraudulent intent, we need not decide whether these elements are in fact necessary for conviction.

As support for their contentions that the government failed to prove either conversion or fraudulent intent, Ross and Collori cite two cases. In the first case, *United States v. Kammer*, 1 F.3d 1161 (11th Cir.1993), Kammer owned and operated a vocational training school in Mobile, Alabama. As her school began to deteriorate financially and students began to drop out, she neglected to promptly transfer unused Pell Grant funds from the school's operating account back to the federal funds trust account. Instead, she left the money in the operating account to pay the school's operating expenses, hoping to refund the government's money when the school increased its cash flows. The court defined conversion as "an act of dominion or control over the property that seriously interferes with the owner's rights." *Id.* at 1165. Reasoning that Kammer had never appropriated any of the federal monies for her own use nor demonstrated any intent to indefinitely deprive the government of its money, the court found the evidence insufficient to convict Kammer of misapplication. *Id.* at 1166.

In the second case, *United States v. Jakeway*, 783 F.Supp. 590 (M.D.Fla.1992), the defendants operated cosmetology and business schools throughout the United States. Two of their schools' financial aid practices prompted the defendants' convictions: (1) when students would sign over excess GSL monies to one of the schools, the school

---

4. The necessity of these elements was conclusorily asserted by the appellants. The government merely argued, as we now hold, that even were one to assume that conversion and fraudulent intent are elements of misapplication, the government put forth sufficient evidence to prove these elements beyond a reasonable doubt.

would hold them in anticipation of subsequent expenses and would refund any unused balance at the student's graduation; (2) with the student's consent, the schools would use a student's excess Pell Grant monies to pay down that student's GSL debt obligations. With respect to the first practice, the *Jakeway* court held that merely deferring refunds too long (until graduation) did not evidence an intent to defraud nor a conversion of the property for the defendants' own use. *Id.* at 597–98. With respect to the second practice, the court noted that there was no statutory or regulatory prohibition against using excess Pell Grant monies against GSL debts and that the students had consented to this appropriation; as a result, the court could not find that the defendants had converted the money with an intent to defraud the government. *Id.* at 598–99.

Ross and Collori argue that their case is analogous to the factual situations in *Kammer* and *Jakeway*. On the contrary, this case presents exactly what the *Kammer* and *Jakeway* courts found to be missing from those prosecutions. The evidence depicts how Ross and Collori intentionally falsified documents and lied to students in order to fraudulently obtain more money than they were entitled to. They appropriated this money for their own personal uses and then made false statements and falsified more documents to conceal their wrongdoing. It is clear that in this case, as opposed to *Kammer* and *Jakeway*, the government has put forth plentiful evidence from which a jury could find both conversion and the defendants' intent to defraud.

4. *False Statements to a Federally Insured Institution (counts 30–31 (Ross only))*

 In counts 30 and 31, Ross was convicted under 18 U.S.C. § 1014 for submitting a false personal financial statement and loan application to Harris Bank in order to procure an $87,000 loan to refinance his yacht debt. Specifically, Ross understated his liabilities on both documents by omitting a $749,000 debt he owed to ISC. The bank relied on Ross's false statements in approving his application for the loan, and it lost

$37,000 when he subsequently defaulted. Ross claims on appeal that the government presented insufficient evidence to establish either (1) that the documents were false or (2) that Harris Bank had been federally insured.

As to the documents' falsity, Ross concedes that the $749,000 debt did not appear on either the financial statement or the loan application. However, Ross points to the fact that ISC financial statements were submitted along with these documents. He maintains that after the bank reviewed his total loan application "package," it approved the loan with "full knowledge of Ross's financial position." His argument is not supported by the record. At trial, the government presented a great deal of evidence that Ross had materially altered the ISC financial statements prior to submitting them to the bank. When the statements were prepared by J.V. Springer, the $749,000 entry in ISC's notes receivable had been accompanied by a footnote explaining that this debt was owed by Ross. When submitted to Harris Bank, this footnote and the reference to the footnote had been deleted, and the reader was left only to guess at the holder of the note. Clearly, this evidence was sufficient for a rational jury to have determined that the documents Ross submitted falsely described his debts.

 As to Harris Bank's federally insured status, this court has held that the government must prove not only that the bank has been federally insured at some point in time, but that the bank was federally insured at the time the false statement was made. *United States v. Shively*, 715 F.2d 260, 264–65 (7th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984). At trial, government witness Lawrence Mizera, vice president and collection manager for Harris Bank, was asked and responded as follows:

> Q: And are deposits in the Harris Bank federally insured?
>
> A: Yes, they are.

"Are" is temporally distinct from "were," and Ross argues that such present-tense testimony is insufficient to prove that the bank was

federally insured at the time he filed his loan application.

In *United States v. Knop*, this court was faced with almost identical testimony at trial and held: "Taken woodenly and literally the testimony might seem to refer only to the time of the trial. In context it could plausibly have been taken by the jury as referring to the time of the commission of the offenses...." 701 F.2d 670, 673 (7th Cir.1983) (footnote omitted). As in *Knop*, in this case additional testimony formed a context against which Mizera's statement could reasonably be interpreted as referring to the bank's insured status at the time of the false statements. Specifically, on cross-examination, Ross's counsel pressed Mizera about whether the bank had in fact been insured, and Mizera gave the following testimony:

Q: Sir, you said the bank took a loss. The bank was insured, weren't they?

A: For a loan like this, no, we weren't.

Q: You were not? I thought you said you were insured?

A: The bank is federally insured. That does not cover loan losses.

Here, defendant's counsel interpreted Mizera's answer on direct testimony as stating that the bank *was* insured at the time of the application and attempted to impeach that. Mizera insisted that the bank did possess insurance, but clarified the extent of its coverage. This colloquy could reasonably be interpreted to mean that although Harris was in fact insured at the time of Ross's wrongdoing, such insurance covers deposits, not loans, and thus did not relieve the bank of its loss when Ross defaulted. Given the whole of Mizera's testimony, and viewing this testimony in the light most favorable to the government, the evidence was sufficient for a rational jury to have found beyond a reasonable doubt that Harris Bank had been federally insured when Ross submitted the false documents.

### 5. *Bankruptcy Fraud (counts 32–34 (Ross only))*

Ross was charged and convicted on three counts of bankruptcy fraud, in violation of 18 U.S.C. § 152. One count charged him with fraudulently transferring ISC assets to a company he controlled and to his friend, Lesia Gast. The other two counts charged him with filing false reports in an attempt to make the transfers appear legitimate. Ross argues that since ISC, and not Ross, was technically the "bankrupt," he could not properly be convicted under § 152. Ostensibly as support for the proposition that § 152 applies only to "bankrupts" themselves, Ross cites several cases from the dawn of this century—namely *Tapack v. United States*, 220 F. 445 (3d Cir.1915); *Israel v. United States*, 3 F.2d 743 (6th Cir.1925); *Carter v. United States*, 19 F.2d 431 (8th Cir.1927). What Ross does not acknowledge is that his cited cases were interpreting § 29b(1) of the Bankruptcy Act of 1898, which by its own language prohibited fraudulent concealment of assets "while a bankrupt." Section 152 of the Bankruptcy Code under which Ross was convicted contains no such limitation, but instead broadly criminalizes:

Whoever knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty [of[5]] perjury ... in or in relation to any case under title 11; or ...

Whoever, either individually or as an agent or officer of any person or corporation, ... with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation....

18 U.S.C. § 152. Ross's argument that his status as a nonbankrupt renders him unsusceptible to conviction under *this* statute, which does not confine its reach only to bankrupts, has no merit.

### D. Sentencing

After their conviction, Ross and Collori were taken into custody on September 27,

---

**5.** At the time of Ross's unlawful conduct, this phrase read "under penalty or perjury" rather than "under penalty of perjury." The error,

however, was corrected by amendment in 1988. Act of Nov. 18, 1988, Pub.L. No. 100–690, Title VII, Subtitle B, § 7017, 102 Stat. 4395.

1991. Collori served his sentence and was released on July 5, 1995. Ross was transferred on February 10, 1992, to a work-release program at a halfway house where he will remain until this month, February 4, 1996.

Although Collori raised several objections to his sentencing in the briefs, both he and the government now agree that his release in July rendered his arguments moot.[6] As a result, we address only Ross's sentencing objections. We review the district court's legal interpretations of the sentencing guidelines *de novo. United States v. Ritsema*, 31 F.3d 559, 564 (7th Cir.1994). Our review of the district court's factual findings, however, is deferential, and we will reverse only if we find them to be clearly erroneous. *Id.*

### 1. *Increase for Obstruction of Justice*

Ross received a two-level increase in offense level for obstruction of justice pursuant to U.S.S.G. § 3C1.1,[7] which reads:

> If the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense, increase the offense level from Chapter Two by 2 levels.

Application Note 3(d) to § 3C1.1 explains that among other conduct, this increase applies to "concealing or directing or procuring another person to ... conceal evidence that is material to an official investigation or judicial proceeding...." According to the district court, the increase in this case was predicated upon (1) Ross's directions to ISC consultant Kermith Owens to falsify the spreadsheet given to Special Agent Livengood in order to conceal excess cash in, and unauthorized withdrawals from, the cash control account; (2) Ross's written instructions to Miller, Cooper to withhold ISC documents from Special Agent Livengood; and (3) Ross's false statements to Special Agent Livengood during his inspection.

Initially, Ross argues that this allegedly obstructive conduct does not fall within the ambit of § 3C1.1 because Agent Livengood's inspection was not an "official investigation," and thus Ross's conduct did not occur "during the investigation" of his offense. However, § 3C1.1 is not limited strictly to conduct occurring during the pendency of some legal proceeding. *See United States v. Kirkland*, 985 F.2d 535, 537 (11th Cir.1993). Rather, courts have interpreted an "official investigation" as requiring investigative action by federal law enforcement or government employees "acting within the course and in furtherance of their official duties." *Id.* at 538 (citing cases). For example, the First Circuit has held that "[h]iding rotten poultry and meat products in the freezer so that Agriculture Department inspectors would not find them ... is a flagrant example of concealing evidence material to an official investigation" resulting in the defendants' eventual convictions for selling, storing, and transporting adulterated meat products. *United States v. Pilgrim Market Corp.*, 944 F.2d 14, 21 (1st Cir.1991). Here, Special Agent Livengood conducted his inspection as part of his official duties acting

---

6. The Supreme Court has held that "a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction." *Sibron v. New York*, 392 U.S. 40, 57–58, 88 S.Ct. 1889, 1900, 20 L.Ed.2d 917 (1968); *see also Minnesota v. Dickerson*, 508 U.S. 366, 371–72 n. 2, 113 S.Ct. 2130, 2135 n. 2, 124 L.Ed.2d 334 (1993). Applying this principle to sentencing, this court has held that a defendant's release from incarceration does not render a sentencing guidelines issue moot where acceptance of the defendant's argument would reduce or eliminate his term of supervised release. *United States v. Swigert*, 18 F.3d 443, 444 (7th Cir.1994); *United States v. Eske*, 925 F.2d 205, 206 n. 2 (7th Cir.1991). Such a situation does not exist in this case. Even were we to agree with Collori's contentions, his term of supervised release would not be shortened.

7. Our references to §§ 3C1.1 and 2F1.1 are to the 1987 version of the guidelines, under which Ross was sentenced. On the other hand, both Ross and we refer for explanation to subsequently added application notes and commentary relating to these provisions. Because the Sentencing Commission's amendments to the commentary to which we refer were intended merely to clarify the text of these provisions, rather than make any substantive changes, it is proper to consider them in our interpretation. *United States v. Fiala*, 929 F.2d 285, 290 (7th Cir.1991).

for the DOE, and thus Ross's obstructive conduct occurred during an "official investigation." Secondly, Ross argues that the increase was not warranted because his conduct did not significantly obstruct or impede Special Agent Livengood or the DOE. We need not address the merits of this argument, however, because as explained below Ross's invocation of this standard is misplaced.

Application Note 3(g) to § 3C1.1 explains that the obstruction increase applies to "providing a materially false statement to a law enforcement officer *that significantly obstructed or impeded the official investigation...*" (emphasis added). Similarly, Application Note 3(d) to § 3C1.1 states that if directing another person to conceal evidence material to an official investigation "occurred contemporaneously with arrest ..., it shall not, standing alone, be sufficient to warrant an adjustment for obstruction *unless it resulted in a material hindrance to the official investigation....*" (emphasis added). These limitations exist to prevent application of the obstruction increase to a mere "exculpatory no"—i.e., where a defendant futilely denies his guilt, or attempts to conceal his wrongdoing, during questioning or apprehension by officials. *See United States v. Fiala,* 929 F.2d 285, 290 (7th Cir.1991).

However, these limitations by their own terms do not apply to Ross's conduct. Application Note 3(g) is inapposite because Ross's obstruction was based primarily on directing Kermith Owens and Miller, Cooper to conceal evidence material to the official DOE investigation, rather than on making false statements to a law enforcement officer. The limitation in Application Note 3(d) is also inapplicable because Ross's conduct did not occur "contemporaneously with arrest." Thus, Ross's argument based on these limitations is without merit.

▪ Lastly, Ross argues that the obstruction increase violated the Fifth Amendment Double Jeopardy Clause because the evidence forming the basis for the increase also formed the basis for his conviction for false statements under count 11. It is important to note that count 11 was a preguidelines count, and thus its sentence was im-

posed separately from the sentence for the counts under the guidelines. The calculation relating to obstruction of justice concerns only the increase of the offense level for the guidelines counts. Had count 11 fallen under the guidelines, Application Note 6 to § 3C1.1 provides:

> Where the defendant is convicted both of the obstruction offense and the underlying offense, the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of § 3D1.2 (Groups of Closely Related Counts). The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2–level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater.

But count 11 was a preguidelines offense, and thus the grouping of offenses required under Application Note 6 does not apply.

Turning to Ross's argument, the Supreme Court held in *Witte v. United States* that where evidence of criminal conduct operates to increase the sentence of another crime, the Double Jeopardy Clause does not bar subsequent prosecution for the enhancing criminal conduct. —— U.S. ——, ——– ——, 115 S.Ct. 2199, 2204–08, 132 L.Ed.2d 351 (1995). The Court reasoned that for double jeopardy purposes, the increase constitutes punishment for the underlying crime and not for the enhancing crime. Thus, bringing a subsequent action to punish the defendant for the enhancing crime does not put him twice in jeopardy for the same offense. *Id.*

The separate sentence determinations for the guidelines counts and for preguidelines count 11 present an analogous situation to that in *Witte,* and thus the Court's analysis controls here. Following *Witte,* the obstruction increase is properly considered under the Double Jeopardy Clause to be punishment for the guidelines offenses only and not for the actual obstructive criminal conduct. Thus, the Fifth Amendment posed no obstacle to charging and punishing Ross under count 11 for the obstructive conduct itself.

### 2. Upward Departure

A district court is authorized to depart from the guidelines range if it finds that "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). In this case, the district court entered a two-level upward departure upon finding that the special impact of Ross's fraud upon his victims was an aggravating circumstance not adequately considered by the Sentencing Commission.

In reviewing upward sentencing departures, we ask: (1) whether the grounds for the departure were appropriate; (2) whether the district court's factual findings underlying the departure were not clearly erroneous; and (3) whether the extent of the departure was reasonable within the structure of the guidelines. *United States v. Panadero*, 7 F.3d 691, 695 (7th Cir.1993) (quoting *United States v. Tai*, 994 F.2d 1204, 1213 (7th Cir.1993)). Ross does not question the district court's factual findings, nor does he argue that the two-level increase was unreasonably harsh. Ross challenges only the district court's grounds for departure, over which we exercise plenary review. *Panadero*, 7 F.3d at 695; *United States v. Willey*, 985 F.2d 1342, 1349 (7th Cir.1993). He submits that the district court erred because the financial detriment to the victims was already taken into consideration by U.S.S.G. § 2F1.1(b)(1). He maintains that there was nothing "special" about the impact of his fraud upon the students denied their GSL refunds.

Application Note 10 to § 2F1.1 sets out a nonexhaustive list of "cases in which the loss determined under subsection (b)(1) does not fully capture the harmfulness and seriousness of the conduct," and thus where "an upward departure may be warranted." Among other examples, the list includes where "the offense involved the knowing endangerment of the solvency of one or more victims," Application Note 10(f), and where "the fraud caused or risked reasonably foreseeable, substantial non-monetary harm,"

Application Note 10(a). Both of these examples exist here.

In this case, almost all of ISC's students were in need of financial assistance—an estimated 99 percent of the school's tuition came from federal financial aid. Most of ISC's students enrolled hoping they would be able to repay their GSL obligations upon securing employment after graduation. However, once student loan checks are cashed, they must be repaid. Where students withdrew from school but were fraudulently deprived of refunds, they remained liable for their loan obligations even though they never received an education. To many of these students, the crushing weight of their student loans spelled almost certain insolvency. Many had federal tax refunds withheld, credit ruined, and personal property seized. Even more importantly, so long as they remain in default, these students are branded ineligible to receive any further federal educational assistance, without which most could never attend another school. *See* 34 C.F.R. § 668.7(a)(7) (1995).

This court remains mindful that some degree of financial distress and injury to credit is inherent in any fraudulent scheme, and that such losses were clearly contemplated by the Sentencing Commission in drafting § 2F1.1. However, 18 U.S.C. § 3553(b) and Application Note 10 to § 2F1.1 instruct that where sufficient aggravating factors above and beyond usual financial loss are present, an upward departure is warranted. The extreme risk of victim insolvency in this case, coupled with the students' nonmonetary loss of potential future educational opportunities, were appropriate grounds for the district court's departure.

### 3. Calculation of the Victims' Loss

Ross argues that the district court's calculation of the total loss for purposes of § 2F1.1 was improper. He offers no competing calculations, but instead reasserts arguments discussed above that the government's methodology for calculating loss was incorrect and that the information was improperly obtained through a criminal investigation rather than from a "federal civil audit."

As discussed earlier, Ross's argument concerning the federal audit has no merit. And it is not the role of this court to make a *de novo* determination of the proper calculation of loss. We review the district court's factual findings of loss only for clear error. *United States v. Dillard,* 43 F.3d 299, 309 (7th Cir.1994). Furthermore, Application Note 8 to § 2F1.1 instructs as follows:

[T]he loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based on the approximated number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of·the fraud and the revenues generated by similar operations. The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss.

This language gives the district court great latitude in constructing the amount of loss from all available information, as does our deferential standard of review. Here, Special Agent Livengood offered testimony that the GSL refunds owed withdrawn ISC students totaled between $885,597 and $938,178, depending on the methodology of calculation. As to Pell Grant overdrafts, the DOE's final bill to ISC came to a figure of $552,049.52. Utilizing the DOE figure and the conservative end of Special Agent Livengood's calculation range, the district court estimated the total loss for sentencing purposes at approximately $1.4 million. On the basis of the evidence, we cannot find that the court committed clear error, or any error, in calculating the amount of loss.

### 4. Appropriateness of Restitution

District court judges enjoy broad discretion in ordering restitution. *United States v. Loscalzo,* 18 F.3d 374, 386 (7th Cir.1994). An order of restitution will not be vacated upon review unless the defendant demonstrates that the district court abused this discretion in determining that restitution was appropriate or in setting the amount to be paid. *Id.*

Ross puts forth two arguments that the district court erred in ordering him to make restitution to his victims in the amount of $1,000,100. First, he argues that the district court did not properly calculate the amount of the loss. But as discussed immediately above, this argument is without merit.

Secondly, he argues that the ordering of restitution was improper because he was indigent throughout the trial. This court will reverse the district court's order as an abuse of discretion if it is "not improbable" that the district court failed to consider the mandatory factors set forth in 18 U.S.C. § 3664(a). *United States v. Boula,* 997 F.2d 263, 267 (7th Cir.1993). The district court must consider: (1) the amount of loss sustained by the victims as a result of the offense; (2) the financial resources of the defendant; (3) the financial needs of the defendant and his or her dependents; (4) the financial earning ability of the defendant and his or her dependents; and (5) any other factors the court deems appropriate. *Loscalzo,* 18 F.3d at 386; 18 U.S.C. § 3664(a). However, although the sentencing court is required to consider the defendant's indigence, this one factor is not solely determinative of whether restitution is appropriate. *United States v. Boyle,* 10 F.3d 485, 492 (7th Cir.1993). Here, the record shows that the district court clearly grappled with the defendant's present penury, but considered other factors to be more important. The victims in this case have very low earning potential, and Ross is a well-educated man with entrepreneurial experience who may be able once again to become personally profitable. This court has held that "a person actually unable to pay may be directed to make restitution, provided there is some likelihood that he will acquire resources in the future." *United States v. Ahmad,* 2 F.3d 245, 247 (7th Cir. 1993). Thus, we do not find that the district court abused its discretion in ordering Ross to make restitution.

The district court's judgments of conviction and sentence for Thomas Ross and John Collori are AFFIRMED.