UNITED STATES of America,
Plaintiff–Appellee,

v.

Ronald J. VIEMONT, Defendant–
Appellant.

No. 96–1149.

United States Court of Appeals,
Seventh Circuit.

Argued May 13, 1996.

Decided July 31, 1996.

Before COFFEY, MANION, and ROVNER, Circuit Judges.

COFFEY, Circuit Judge.

Appellant Ronald J. Viemont pled guilty to one count of wire fraud, 18 U.S.C. § 1343. He was sentenced to 15 months' imprisonment and ordered to pay a $4,000 fine and $200,000 in restitution. On appeal, Viemont maintains the district court failed to properly consider the factors in 18 U.S.C. § 3664 in setting the amount of restitution and that his sentence was improperly increased based upon the court's finding that he participated in "more than minimal planning" as reflected in U.S.S.G. § 2F1.1(b)(2). We affirm.

## I. BACKGROUND

Appellant Viemont was an investment consultant and operated a firm called R.J. Viemont and Company in Peoria, Illinois. In that capacity, he had the ability, with authorization, to order expenditures, investments, and the transfer of funds entrusted to him on behalf of his clients. Among his clients were the Policemen's Pension Fund for the City of Danville, Illinois ("PPF–Danville"), the Firefighters' Pension Fund for the City of Danville, Illinois ("FPF–Danville"), the Policemen's Pension Fund for the City of Taylorville, Illinois ("PPF–Taylorville"), and the 579 Credit Union located in Danville, Illinois ("Credit Union").

Viemont caused the funds from PPF–Danville and FPF-Danville to be invested with an income portfolio management firm called Investment Management and Research of St. Petersburg, Florida ("Investment Management"). Viemont also arranged for funds from PPF–Taylorville and the Credit Union to be invested with an income portfolio management firm called Multi–Financial Securities Corporation of Englewood, California ("Multi–Financial").

On August 19, 1992, Viemont forged the Danville City Treasurer's signature on two documents that he prepared which directed Investment Management to wire transfer $100,000 from PPF–Danville and $100,000 from FPF–Danville into the Murdock Mining

Lawrence S. Beaumont (argued), Office of the United States Attorney, Urbana Division, Urbana, IL, for Plaintiff–Appellee.

Richard H. Parsons (argued), Peoria, IL, for Defendant–Appellant.

Company's account at the First Midwest Bank of Danville. The transactions were conducted without the required authorization of the Danville City Treasurer. The Murdock Mining Company account had no connection to either pension fund.

From September 1992 through April 1993, Viemont mailed a monthly investment report to the Danville City Treasurer, and these reports failed to reflect the withdrawal of the $200,000 from the pension funds. As soon as the Danville City Treasurer became aware of the unauthorized money transfers, she called the matter to Viemont's attention.[1] Viemont responded with a fictitious story that the transfers were merely between the pension funds, and that she had no reason to be concerned. When the Danville City Treasurer attempted to balance the two pension funds and discovered they were short by $100,000 each, Viemont stated that he would take care of the matter.

When the annual year-end audit disclosed the missing money, Viemont told the Danville City Treasurer that he forgot to mention the purchase of two $100,000 certificates of deposit, one for each pension fund. The Danville City Treasurer repeatedly attempted to obtain copies of the CDs and written documentation of the purchases from Viemont, but was unsuccessful, and later discovered that no CDs had been purchased for the funds.

On July 29, 1993, Viemont prepared two more documents addressed to Multi–Financial directing a transfer of $100,000 from PPF–Taylorville and $100,000 from the Credit Union to Palmer American National Bank in Danville, Illinois ("Palmer Bank"). Viemont also added $15,000 to this account (apparently to simulate the interest a CD would earn), which he had removed from another client's account.[2] On August 2, 1993, Viemont and another individual used the $215,000

to purchase a CD from the Palmer Bank. This Palmer Bank CD was used in turn to collateralize a loan to Murdock Mining Company. Viemont and the other individual[3] took the $215,000 in loan money and transferred it back into the accounts of PPF–Danville and FPF–Danville. Officials of PPF–Taylorville and the Credit Union were not aware their money was being used for this purpose.

On July 6, 1995, a grand jury indicted Viemont on four counts of wire fraud. The first two counts were for the original two wire transfers on August 19, 1992, Count I relating to the transfer from PPF–Danville, and Count II relating to the transfer from FPF–Danville. The second two counts were for the wire transfers on July 29, 1993, Count III relating to the transfer from PPF–Taylorville, and Count IV relating to the transfer from the Credit Union. Viemont pled guilty to Count IV on August 7, 1995, pursuant to a written plea agreement, and the remaining counts were dismissed.

The Presentence Report ("PSR") calculated Viemont's offense level as 14, which included a base offense level of 6 (per U.S.S.G. § 2F1.1(a)), a 7–point enhancement for the $200,000 loss (per U.S.S.G. § 2F1.1(b)(1)(H)), a 2–point increase because the offense involved "more than minimal planning" (per U.S.S.G. § 2F1.1(b)(2)(A)), a 2–point increase because the offense involved the abuse of a position of trust (per U.S.S.G. § 3B1.3), and a 3–point reduction for acceptance of responsibility (per U.S.S.G. § 3E1.1). As Viemont had no criminal record, his criminal history category was I. His guideline range was determined to be 15 to 21 months.[4] The PSR noted that $200,000 in restitution was necessary to make the pension fund victims whole. The Probation Department did not receive Viemont's relevant financial disclosures in time to include them in the original PSR;

---

1. An FBI investigation had begun at this point.

2. Also apparently without authorization.

3. The purpose of the entire scheme seemed to be to provide collateral so that third parties could attempt to purchase Ziegler Mining Corporation, through their corporation, Murdock Mining Company.

4. The PSR appears to have utilized the 1994 edition of the guidelines. Because Viemont was sentenced on January 12, 1996, the 1995 edition, which became effective on November 1, 1995, should have been utilized. As the relevant provisions were not amended, this error was harmless.

however, a supplement was issued after the relevant data was provided. The supplement provided the following evaluation:

> Based on a quick analysis of the information provided, the defendant has a negative net worth of approximately $108,480 and a cash flow of about $370 per month. Most of his assets consist of equity in his residence. Almost half of his unsecured debts are attorneys' fees. Mr. Viemont is 56 years old, has a college education, and is employed with an annual salary of $25,000 to $30,000 per year. He reports that he previously earned $75,000 to $80,000 per year when self-employed. His securities license was suspended in 1993. He may be unable to generate that type of income in the future. The defendant's spouse is employed and generates one-half of the family income. He has no dependent children. Based on the above information I believe the defendant has the present and future ability to earn income that would allow him to pay a substantial portion of the restitution. An order of restitution is particularly important in this case because the defendant stole from a pension fund.[5]

Viemont was sentenced on January 12, 1996. At sentencing, Viemont objected to the enhancement for "abuse of trust" and "more than minimal planning." He also argued to the court that he was entitled to a downward departure because the crime was an isolated act of aberrant behavior. Lastly, Viemont maintained that he was financially incapable of paying restitution. The district judge rejected all of his arguments. As to the "more than minimal planning" issue, the court opined that the enhancement was proper in view of the fact that the offense involved repeated criminal acts, involved considerable planning, and victimized more than one entity. The trial judge sentenced him to 15 months' imprisonment and imposed a $4,000 fine. As to restitution, the district court adopted the findings of the PSR, and ordered Viemont to pay $200,000 in restitu-tion, $100,000 each to PPF–Danville and FPF–Danville.[6]

## II. ISSUES

Viemont raises two issues on appeal. First, he argues that the order of restitution is improper because the trial court failed to properly evaluate the factors in 18 U.S.C. § 3664, notably failing to consider his hopeless financial position and instead relying on the "speculative" conclusions in the PSR. Second, Viemont argues that the enhancement to his sentence for "more than minimal planning" is erroneous, because his offense did not involve any planning beyond that which would normally occur in any wire fraud.

## III. DISCUSSION

### A. Standard of Review/Applicable Law

 This court will vacate an order of restitution only if the defendant demonstrates that the district judge abused his discretion in determining that restitution was warranted or in setting the amount to be paid. *United States v. Ross*, 77 F.3d 1525, 1552 (7th Cir.1996). We review a district court's enhancement of a sentence for "more than minimal planning" for clear error. *United States v. Channapragada*, 59 F.3d 62, 65 (7th Cir.1995).

The procedures for awarding restitution are set forth in 18 U.S.C § 3664, which provides as follows:

> (a) The court, in determining whether to order **restitution** under section 3663 of this title and the amount of such **restitution**, shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.
> (b) The court may order the probation service of the court to obtain information

---

5. The original PSR reports that Viemont's securities license was revoked in October 1993, but fails to reflect whether, if ever, the defendant will be eligible for reinstatement of his license.

6. The funds transferred on July 29, 1993 were returned to PPF–Taylorville and the Credit Union.

pertaining to the factors set forth in subsection (a) of this section. The probation service of the court shall include the information collected in the report of presentence investigation or in a separate report, as the court directs.

(c) The court shall disclose to both the defendant and the attorney for the Government all portions of the presentence or other report pertaining to the matters described in subsection (a) of this section.

(d) Any dispute as to the proper amount or type of **restitution** shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government. The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant and such defendant's dependents shall be on the defendant. The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires.

. . .

18 U.S.C. § 3664 (1994).[7]

The guidelines provide for a 2–level increase in offense level for any offense involving fraud or deceit which "(A) involved more than minimal planning...." U.S.S.G. § 2F1.1(b)(2).

"More than minimal planning" is extensively defined in the guidelines:

(f) "More than minimal planning" means more planning than is typical for commission of the offense in a simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense, other than conduct to which § 3C1.1 (Obstructing or Impeding the Administration of Justice) applies.

"More than minimal planning" is deemed present in any case involving repeated acts over a period of time, un-less it is clear that each instance was purely opportune. Consequently, this adjustment will apply especially frequently in property offenses.

In an assault, for example, waiting to commit the offense when no witnesses were present would not alone constitute more than minimal planning. By contrast, luring the victim to a specific location, or wearing a ski mask to prevent identification, would constitute more than minimal planning.

In a commercial burglary, for example, checking the area to make sure no witnesses were present would not alone constitute more than minimal planning. By contrast, obtaining building plans to plot a particular course of entry, or disabling an alarm system, would constitute more than minimal planning.

In a theft, going to a secluded area of a store to conceal the stolen item in one's pocket would not alone constitute more than minimal planning. However, repeated instances of such thefts on several occasions would constitute more than minimal planning. Similarly, fashioning a special device to conceal the property, or obtaining information on delivery dates so that an especially valuable item could be obtained, would constitute more than minimal planning.

In an embezzlement, a single taking accomplished by a false book entry would constitute only minimal planning. On the other hand, creating purchase orders to, and invoices from, a dummy corporation for merchandise that was never delivered would constitute more than minimal planning, as would several instances of taking money, each accompanied by false entries.

U.S.S.G. § 1B1.1, comment. (n.1(f)).

The guidelines further provide:

The extent to which an offense is planned or sophisticated is important in assessing its potential harmfulness and the dangerousness of the offender, independent of the actual harm. A complex

---

7. This statute has recently been substantially amended, but the amendments did not take effect until April 24, 1996, thus they have no bearing on this case.

scheme or repeated incidents of fraud are indicative of an intention and potential to do considerable harm. In pre-guidelines practice, this factor had a significant impact, especially in frauds involving small losses. Accordingly, the guideline specifies a 2–level enhancement when this factor is present.

U.S.S.G. § 2F1.1, comment. (backg'd).

## B. Restitution

Viemont argues that the district court failed to adequately consider the factors in 18 U.S.C. § 3664, and improperly accepted the "speculative" conclusions in the PSR. Viemont claims that the district court failed to adequately consider his negative net worth (-$108,480), his small cash flow ($370 a month), his modest salary ($25,000 to $30,000 a year), and maintains that he does not have the financial capacity to have any hope of paying the restitution.

■ District judges "enjoy broad discretion in ordering restitution." *Ross*, 77 F.3d at 1552. However, in ordering restitution the district court must consider the mandatory factors set forth in 18 U.S.C. § 3664(a): (1) the amount of loss sustained by the victims as a result of the offense; (2) the financial resources of the defendant; (3) the financial needs of the defendant and his or her dependents; (4) the financial earning ability of the defendant and his or her dependents; (5) any other factors the court deems appropriate. *Id.* This court will reverse an order of restitution if the defendant shows either (1) that the district court repudiated a mandatory factor, or (2) that it was "not improbable" that the judge failed to consider a mandatory factor and was influenced thereby. *United States v. Clemmons*, 48 F.3d 1020, 1023 (7th Cir.1995), *overruled on other grounds by United States v. Allender*, 62 F.3d 909 (7th Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 781, 133 L.Ed.2d 732 (1996). *See also United States v. Gio*, 7 F.3d 1279, 1291 (7th Cir.1993). "Although advisable to do so, the sentencing judge need not express explicit reliance on each of the mandatory factors." *Id. See also United States v. Boyle*, 10 F.3d 485, 491 (7th Cir.1993). Further, the PSR can provide the relevant summary of the mandatory factors. *United States v. Lesperance*, 25 F.3d 553, 558 (7th Cir.1994). *See also Clemmons*, 48 F.3d at 1023; *Gio*, 7 F.3d at 1292.

■ The burden is on the defendant to establish his current and potential financial resources by a preponderance of the evidence. *Boyle*, 10 F.3d at 491. A defendant's indigence is not determinative as to whether restitution is appropriate. *Ross*, 77 F.3d at 1552; *Lesperance*, 25 F.3d at 558. "Section 3664(a) does not require that the court find that a defendant can pay restitution, only that the judge consider his ability to pay." *Clemmons*, 48 F.3d at 1023. A person who is currently unable to pay restitution may nonetheless be ordered to make restitution, if "there is some likelihood" that he will acquire sufficient resources in the future. *United States v. Simpson*, 8 F.3d 546, 551 (7th Cir. 1993). "If a district court 'possesse[s] the necessary information' regarding the financial condition of a defendant, there is no abuse of discretion in ordering restitution— even where the defendant has a 'negative net worth and a monthly cash flow of zero.'" *United States v. Johnson–Wilder*, 29 F.3d 1100, 1106 (7th Cir.1994). *See also United States v. Nelson*, 5 F.3d 254, 259 (7th Cir. 1993) (negative net worth not dispositive), *cert. denied*, — U.S. —, 114 S.Ct. 937, 127 L.Ed.2d 228 (1994).

■ The factors a court may consider in assessing the likelihood a defendant will be able to make restitution include his education and entrepreneurial talents. See *Ross*, 77 F.3d at 1552 (defendant "is a well-educated man with entrepreneurial experience who may be able once again to become personally profitable"); *Clemmons*, 48 F.3d at 1023–24 ("defendant's ingenuity and capabilities demonstrated in concocting the fraudulent scheme" show the potential to pay restitution); *Boyle*, 10 F.3d at 492 (defendant's "'great zeal' in operating businesses and engaging in substantial financial transactions would enable him to one day earn a significant income"); *United States v. Boula*, 997 F.2d 263, 268–69 (7th Cir.1993) ("Given the ingenuity and capabilities the defendants demonstrated in concocting their fraudulent scheme, we are of the opinion that there is

more than a possibility they will earn sufficient money upon their release from prison to reimburse the thousands of victims they so maliciously preyed upon.").

■ The record makes it clear that the district court considered the mandatory factors in 18 U.S.C. § 3664. We note that the amount of the loss was not disputed. We also note that the district court reviewed and adopted the supplement to the PSR, which included a review of Viemont's current financial position, the suspension of his securities license, his wife's income,[8] his own reduced income, and the fact Viemont had no dependents. A more detailed explanation by the district court would have been advisable, especially given that the court ordered full restitution while the PSR opined that the defendant would be able to only "pay a substantial portion of the restitution." The lack of a detailed explanation is not fatal, however, as an order of restitution can be proper even if the defendant lacks the current ability to pay.

The district court did not err in accepting the PSR's conclusion that Viemont had strong potential to generate income, despite his current financial difficulties. It is undisputed that Viemont had a substantial income prior to his current difficulties,[9] and is well-educated and skilled in business. Further, he had displayed considerable ingenuity in concocting the fraud and attempting to conceal it. Under the circumstances, there is "some likelihood" that Viemont will generate sufficient income in the future to pay the restitution.[10] At oral argument, Viemont's counsel conceded that if paying restitution became utterly impossible, Viemont could petition to have the district court modify the order.[11]

## C. More than Minimal Planning

■ Viemont argues that the enhancement for "more than minimal planning" was inappropriate, as he did no more planning than was typical for an offense of this nature. Viemont stresses that he did no "preoffense" planning to avoid detection.

A sentence may be enhanced under U.S.S.G. § 2F1.1(b)(2) where "1) there is more planning than is typical for commission of the offense in simple form; 2) steps are taken to conceal the offense; 3) criminal acts, each of which are not purely opportune, are repeated over a period of time." *United States v. Brown,* 47 F.3d 198, 204 (7th Cir. 1995). *See also United States v. Michalek,* 54 F.3d 325, 329 (7th Cir.1995). Generally, more than two acts are required to trigger the "repeated acts" prong of the enhancement. *See Channapragada,* 59 F.3d at 65; *United States v. Maciaga,* 965 F.2d 404, 407 (7th Cir.1992).

There can be no doubt that the enhancement was appropriate as Viemont committed repeated criminal acts over time and made substantial efforts to conceal his crimes. Viemont performed four fraudulent wire transfers over eleven months, provided seven months' worth of false reports to the city treasurer to conceal the fraud, and provided verbal assurances to the city treasurer to conceal the fraud. The four fraudulent transfers were not merely opportune. The first two were part of a larger scheme to provide funding to a third party, while the second two were made for the purpose of concealing the earlier fraudulent transfers. Further, the seven months of false reports (which concealed his crime) by themselves provide a sufficient basis for the enhance-

---

8. Approximately $28,000 a year.

9. At present, he and his wife earn a combined income of approximately $55,000.

10. This court's recent decision in *United States v. Lampien,* 89 F.3d 1316 (7th Cir.1996) is distinguishable, as Viemont's financial prospects for the payment of restitution are far better than the defendant in that case.

11. There is also another possibility for repayment. Viemont maintains that a civil lawsuit is pending which could provide the funds necessary

to make the pension funds whole again. However, it is obvious that a criminal penalty has far more force and effect than a civil judgment. "If the defendants are not seriously interested in making full restitution to their victims, this order should overcome that problem and provide them with the necessary incentive and motivation to make those payments in a timely fashion." *United States v. Boula,* 997 F.2d 263, 269 (7th Cir. 1993).

ment. *See* U.S.S.G. § 1B1.1, comment. (n.1(f)) (concealing the taking of money with multiple false bookkeeping entries). *See also Michalek,* 54 F.3d at 330 (presenting false documents to trustee, including phony appraisal); *Channapragada,* 59 F.3d at 65 (defendant misrepresented the value of collateral four times).

## IV. CONCLUSION

While a more detailed explanation by the district court may have been preferable, the record demonstrates that the district judge adequately considered the factors in 18 U.S.C. § 3664, and the order of restitution is proper. Further, given Viemont's repeated criminal acts and extensive efforts at concealment, the enhancement under U.S.S.G. § 2F1.1(b)(2) was appropriate. The district court is

AFFIRMED.