UNITED STATES of America, Appellee,

v.

Philip J. MENZA, Defendant–Appellant.

No. 97–2770.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 20, 1998.

Decided Feb. 25, 1998.

Laura A. Przybylinski (argued), Office of the United States Attorney, Madison, WI, for Plaintiff–Appellee.

Reesa Evans (argued), Madison, WI, for Defendant–Appellant.

Before BAUER, COFFEY, and ROVNER, Circuit Judges.

BAUER, Circuit Judge.

Philip J. Menza pled guilty to a three-count information, charging him with possession of three different listed chemicals with intent to manufacture a controlled substance, in violation of 21 U.S.C. § 841(d)(1). The district court held a sentencing hearing and sentenced Menza to 37 months in prison for each count, to run concurrently, and to be followed by three years of supervised release for each count, also to run concurrently. In addition, the district court ordered Menza to pay restitution to the victims of his crimes as authorized by the Victim and Witness Protection Act, 18 U.S.C. §§ 3663, 3664. Menza does not challenge his sentence; rather, he appeals the specific amount of restitution that the district court ordered him to pay and argues that the district court abused its discretion by: (1) ordering restitution to the victims of his criminal conduct for losses they incurred which were not directly related to his offenses of conviction; (2) ordering restitution for losses not authorized by the Victim and Witness Protection Act; and (3) imposing restitution in light of his inability to pay. For the reasons set forth below, we affirm in part, vacate in part, and remand this case to the district court for further proceedings.

## Background

On December 8, 1996, fire rescue personnel were called to an apartment building at 350 West Washington Avenue in Madison, Wisconsin. The Madison Police Department also dispatched a police officer to the building. Officer Dale Reuter entered the apart-

ment building and, on the fifth floor, found a man, later identified as the defendant Philip Menza, lying on the floor in the hallway outside of his apartment surrounded by firefighters. Menza was complaining that he could not breathe. An ambulance was called, and Menza was taken to the hospital.

Officer Reuter then entered the apartment, which had a strong odor, and discovered some type of laboratory and chemical set-up, which included beakers, tubing, and some funnels. He found some bottles on the floor in the bathroom and boxes containing similar bottles outside of the bathroom. He also noticed a crushed can with the word "ether" on it and some white powder on the floor in the doorway of the apartment.

Officer Reuter called for back-up, and the Madison Fire Department Hazardous Incident Team ("HIT") later arrived at the scene. HIT entered the apartment and identified one potentially explosive chemical which was not securely capped. A member of HIT capped that open bottle, and the team then ensured that all other bottles of chemicals were properly and securely capped and sealed. After sealing all of the bottles, HIT then checked for any explosive pockets in the apartment. The team was unable to find any hazardous areas or explosive pockets and deemed the apartment safe from potential explosion or hazard. Finally, HIT left the scene after ensuring that the apartment door was closed and secured until other law enforcement officers returned with a search warrant.

Later, Special Agent Jeffrey Boobar of the Department of Justice, Drug Enforcement Agency ("DEA") and a Clandestine Laboratory Enforcement Team (the "Team") entered the apartment pursuant to a warrant, searched the premises, and began to dismantle the laboratory equipment and chemical set-up and to remove various items from Menza's apartment. Agent Boobar explained that according to DEA regulations, the only items the Team is able to keep are items that it deems either finished products to be used as evidence or unknown liquid samples which are not labeled or cannot be identified. Otherwise, all other items, including all equipment and chemicals, whether toxic/hazardous or not, are removed from the premises and turned over to an independent company for destruction and disposal. In compliance with these regulations, the DEA and the Team turned over all other chemicals and all equipment to Advanced Environmental Technical Services ("AETS"), a hazardous waste disposal company. Although the items turned over to AETS were deemed hazardous and toxic by the Team, some were common household items, which had no association with any criminal activity. Thereafter, AETS forwarded a bill to the DEA for $10,625.42, reflecting the cost it incurred from destroying and disposing of the items collected from Menza's apartment.

Meriter Retirement Services ("Meriter"), the owner of the building and apartment where Menza lived and set up his laboratory, also incurred clean-up and replacement costs after the police and DEA finished inspecting the apartment and removing the above-mentioned items. Meriter also submitted an invoice to the government, indicating that it had suffered a total loss of $13,878.12, which included the costs incurred for attorneys' fees.

Menza remained in the hospital for several days. Upon his release, he was taken to Dane County Jail where he was served by the state with a complaint, alleging several drug-related charges. On January 29, 1997, Menza was indicted by a federal grand jury on similar drug-related charges, including *manufacturing amphetamines and keeping a drug in the house.* As a result of the federal charges, the state complaint was dropped. However, before trial on April 18, 1997, an information was filed in federal court against Menza, alleging possession of three listed chemicals with intent to manufacture a controlled substance. On that same day, Menza pled guilty to the charges alleged in the information, and the indictment was dismissed.

The district court then held a two-day sentencing hearing. At the hearing, testimony established that, in compliance with DEA regulations, once the Team had finished its inspection, all items were automatically removed from the apartment and turned over to AETS for disposal. The bill from AETS

for $10,625.42 was presented by the government as evidence of the cost the DEA incurred from the destruction and disposal of the items confiscated from Menza's apartment. This bill, however, did not itemize in any manner or distinguish between the cost for disposal of the listed chemicals for which Menza was convicted and the cost which resulted from the disposal of all other non-criminal and non-related items and materials that were confiscated from Menza's apartment by the DEA.

Similarly, the government also presented the bill from Meriter as evidence of losses incurred by another victim of Menza's crimes. The total amount submitted by Meriter was $13,878.12, which included clean-up costs, furniture and appliance replacement costs, and attorneys' fees. The district court properly excluded attorneys' fees from the restitution order, which reduced the bill to $6,020.17. The court further reduced the costs for furniture and appliance replacement by one-half to account for daily use and depreciated value, which reduced the total amount of recovery for Meriter to $5,205.00.

Lastly, the district court concluded, over defense counsel's objections, that Menza had the means and potential earning ability to pay restitution to his victims. Accordingly, on June 30, 1997, the district court sentenced Menza to 37 months in prison, to be followed by three years of supervised release. Pursuant to the Victim and Witness Protection Act ("VWPA"), the district court also ordered Menza to pay restitution to the victims of his crimes—$10,625.42 to the DEA and $5,205.00 to Meriter, for a total restitution award of $15,830.42. Judgment was entered on July 2, 1997, and Menza filed a timely notice of appeal on July 10, 1997.

Menza specifically admits and understands his responsibility that he owes proper restitution to the victims of his offenses for their recoverable losses as defined by (and limited by) the VWPA. On appeal, Menza does not challenge the fact that the district court ordered him to pay restitution, but he argues that some of the costs that the DEA and Meriter claim as losses involve conduct which is not directly related to his specific offenses of conviction. Additionally, the defendant contends that the restitution order seems to include compensation to the victims for losses which are not authorized by the VWPA. Menza, therefore, argues that the amount of restitution should be reduced to reflect the proper calculation of losses to be recovered by each victim. Menza finally asks this court to determine whether the district court abused its discretion by imposing restitution in light of his inability to pay. With these facts in mind, we now turn to the issues presented for review.

## Analysis

■ The VWPA specifically authorizes a district court sentencing a defendant convicted of an offense under 21 U.S.C. § 841 to "order ... that the defendant make restitution to any victim" of his crime. *See* 18 U.S.C. § 3663(a)(1)(A). The decision to order restitution pursuant to the VWPA lies within the discretion of the district court, and we review that decision for an abuse of discretion. *United States v. Ross*, 77 F.3d 1525, 1552 (7th Cir.1996); *United States v. Murphy*, 28 F.3d 38, 40 (7th Cir.1994).

■ Menza argues that he does not have to pay restitution to the victims of his crimes in excess of the losses directly caused by his specific criminal conduct involved in the offenses of conviction. He contends that the district court failed to determine the appropriate amount of restitution. Menza focuses on the crimes charged in the information: three counts of possession of a listed chemical with intent to manufacture a controlled substance, in violation of 21 U.S.C. § 841(d)(1), to which he pled guilty.[1] He suggests that the district court may order restitution only for losses incurred from those specific activities directly related to the charges reflected in the information and nothing else.

---

1. Title 21 U.S.C. § 841(d)(1) provides that a person is criminally liable if he or she knowingly or intentionally possesses a listed chemical with the intent to manufacture a controlled substance. The information specifically listed the chemicals

Menza possessed: Piperidine, Nitroethane, and Methylamine Hydrochloride. It is important to remember that the three counts in the information charging possession of those chemicals are the only ones to which Menza pled guilty.

Specifically, Menza claims that the DEA cannot recover its costs for destruction of all the nontoxic, non-hazardous chemicals, standard laboratory equipment, and ordinary household items, which it confiscated as a matter of routine procedure and turned over to AETS for disposal. Defense counsel suggests that there are numerous items that the DEA removed from his apartment and AETS subsequently destroyed which Menza legally possessed because it was not illegal to possess those items (even though they may be classified as drugs and/or drug paraphernalia and laboratory equipment). Counsel asserts that those items, certain legal drugs and laboratory equipment, were not associated with or in any way directly related to defendant's criminal conduct in the offenses of conviction, and therefore, the cost of the their destruction should not be included in the calculation of the DEA's losses for which Menza owes restitution. Furthermore, defendant claims there were items confiscated and destroyed that had absolutely nothing to do with drugs, chemicals, or any sort of laboratory equipment or chemical set-up; they were common household items, which also should be excluded from the calculation of DEA losses.

Menza also challenges the bill Meriter submitted to the government, arguing that the costs the building owner allegedly incurred to clean-up the apartment and to replace certain items may have been excessive or, at a minimum, lacked sufficient explanation for the court to automatically conclude that the costs submitted were reasonable and/or necessary. Menza acknowledges the fact that the district court reduced the replacement costs by one-half. However, he asserts that this reduction still may not be sufficient based upon a closer examination of Meriter's claim for losses. In response, the government asserts that the record clearly supports the district court's determination that restitution is an appropriate penalty to compensate the DEA and Meriter (as victims of Menza's crimes) for their losses and argues that requiring more detailed invoices from the victims and reviewing the initial calculations would be costly, time-consuming, and unnecessary.

The VWPA permits the district court to order restitution, in its discretion, to any *victim* of the defendant's criminal conduct *directly related to the offense* of conviction. *See Hughey v. United States*, 495 U.S. 411, 418, 110 S.Ct. 1979, 1983–84, 109 L.Ed.2d 408 (1990) (emphasis added). As defined by the VWPA, a victim is "a person directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663(a)(2). Consideration of the statutory language suggests persuasively that Congress intended restitution to be precisely tied to the loss caused by the offence of conviction. *Id.; see also Hughey*, 495 U.S. at 418, 110 S.Ct. at 1983–84. Examination of the conduct constituting the commission of a crime only involves consideration of the conduct to which the defendant pled guilty and nothing else. *Hughey*, 495 U.S. at 416, 417, 418, 110 S.Ct. at 1982–83, 1983, 1983–84. Specifically, the defendant's agreement or acknowledgment to pay restitution to any victim(s) of the crime(s) to which he pled guilty does not include payment of restitution for other tangential or peripheral losses, which stemmed from separate counts of an indictment which were dismissed. *United States v. Guthrie*, 64 F.3d 1510, 1515, 1516 (10th Cir.1995).

In making this determination, the VWPA provides that the district court shall consider such factors as:

> (I) the amount of the loss sustained by each victim as a result of the offense; and

> (II) the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependants, and such other factors as the court deems appropriate.

18 U.S.C. § 3663(a)(1)(B)(i)(I) & (II). The government has the burden of presenting a victim's claim for restitution to the district court and to support that claim by a preponderance of the evidence. 18 U.S.C. § 3664(e); *see also United States v. Viemont*, 91 F.3d 946, 951 (7th Cir.1996). Although the VWPA (as amended in 1996) does not require the district court to make explicit findings to justify its decision to order restitution, the statute does include a provision which permits the court to "refer any issue

arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact." 18 U.S.C. § 3664(d)(6). The VWPA further requires that "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by a preponderance of the evidence." 18 U.S.C. § 3664(e).

■ Even though the statute explicitly does not require that the district court determine findings of fact each and every time it orders restitution, the VWPA does contemplate that factual disputes may arise (and most likely will arise) while the district court considers the government's request that restitution be provided for the victims of the defendant's criminal activity. The Act provides a procedure by which to resolve those disputes, see 18 U.S.C. § 3664(d)(6), and requires that the resolution of any factual dispute be supported by a preponderance of the evidence. See 18 U.S.C. § 3664(e). In consideration of these statutory provisions, we conclude that the VWPA recognizes that specific findings of fact reflected in the record still are necessary at times and contemplates that district courts provide an explanation of their reasoning, supported by articulated findings of fact.

In this circuit, we have issued mandates to district courts to provide sufficient explanation of their reasoning and to include findings of fact when entering an award of costs. *See, e.g., Cengr v. Fusibond*, 135 F.3d 445 (7th Cir.1998); *Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926, 946 (7th Cir. 1997) (noting that the district court's order regarding costs "might have been more clear had [it] specifically itemized those costs and addressed the [plaintiff's] arguments"); *Weihaupt v. American Med. Ass'n*, 874 F.2d 419, 430–31 (7th Cir.1989) (remanding issue of costs for a hearing to determine whether the award of costs was reasonable in light of the district court's failure to make any findings of fact). Unless we know why a district court included specific costs in an order granting restitution, we have no adequate basis upon which to review the decision. *Gardner v. Southern Ry. Sys.*, 675 F.2d 949, 954 (7th Cir.1982).

■ In *United States v. Patterson*, 837 F.2d 182 (5th Cir.1988), the Fifth Circuit concluded:

> The decision to assign reasons is committed to the sound discretion of the district court, guided by this singular inquiry— absent an assignment of its reasons, does the record contain sufficient data for the appellate court to perform its mandated review? If the record provides an adequate basis for that review, the court need not assign specific reasons for its decision to order full [or partial] restitution. If the record is insufficient, reasons must be assigned.

837 F.2d at 183–84. We find this reasoning persuasive and appropriate in this circumstance. Even though the district court is not required by statute to make specific findings of fact, if the record does not sufficiently support its conclusions or clarify its reasoning, then we ask that the court provides us with that information, including its specific findings of fact, to facilitate our review.

■ In reviewing the record, we find that there is an inadequate explanation and insufficient reasoning as to why the district court accepted, on their face, the DEA's invoice and, except for the reduction of replacement costs, Meriter's invoice, without requiring any further evidence or proof that all costs incurred were directly related to Menza's convictions. In the absence of any record to reflect the court's factual findings regarding the victims' actual losses which directly resulted from the offenses of conviction, we cannot determine whether the district court abused its discretion in awarding restitution in the amount of $15,830.42. Although the district court reduced Meriter's replacement costs by one-half to account for ordinary wear and tear, there is not sufficient evidence to support a finding that this was or was not an abuse of discretion, particularly when there are clear inconsistencies in the record. This lack of support requires us to remand the case to the district court for further consideration and proceedings consistent with this opinion.

On remand, the court should determine several factors. First, the restitution order must directly relate to the crimes charged in

the information. Second, the government must provide the district court with more than just the general invoices submitted by the DEA and Meriter, ostensibly identifying the amount of their losses. The government must provide sufficient explanations (supported by evidence reflected in the record) as to how these invoiced losses directly relate to Menza's criminal conduct involved in his underlying convictions. The VWPA requires the government to provide to the district court a complete accounting of the losses each victim suffered "to the extent possible." 18 U.S.C. § 3664(a).

Third, the district court must consider whether the costs the DEA incurred from the clean-up, destruction, and disposal of the chemicals and laboratory equipment were matters of routine policy and procedure within the agency, which may prevent recovery, or whether the costs incurred were unique to this case and accrued solely and directly as a result of Menza's criminal conduct. It is important to note that the first team to investigate the apartment, the Madison Fire Department HIT, determined that the apartment had ceased to present a potentially hazardous situation, and that the DEA returned with its Team pursuant to a search warrant as a matter of routine procedure to investigate.

■ Various courts and other circuits have held that investigatory costs do not constitute a loss to be recovered in the form of restitution within the scope of the VWPA;[2] such costs are routinely incurred by the government for the procurement of evidence. *See United States v. Gibbens*, 25 F.3d 28, 33 (1st Cir.1994); *Ratliff v. United States*, 999 F.2d 1023, 1026 (6th Cir.1993); *United States v. Daddato*, 996 F.2d 903, 905 (7th Cir.1993). It has been determined that unless specifically authorized (and the VWPA does not authorize such costs), investigatory and/or prosecution costs incurred by the government are not *direct* losses relating to defendant's criminal conduct which can be recovered. *Gib-*

*bens*, 25 F.3d at 33 (emphasis added). The government can be a victim entitled to restitution under the VWPA, but there also are situations where the government should bear its own costs in relation to its decisions to investigate and/or to prosecute, even though these decisions may have been motivated by or in response to potential criminal activity. If the DEA in fact did return to the building to investigate Menza's apartment and its subsequent confiscation and removal of several items from his apartment were matters of routine procedure during an investigation, then those costs incurred may be classified as investigation costs, which pursuant to the VWPA are not authorized losses recoverable in the form of restitution.

Fourth, as a result of the *alleged* contamination in Menza's apartment, Meriter hired an environmental company to assess the condition of the apartment and included that expense in the invoice it submitted to the government. However, both the DEA and Meriter submitted costs for what appears to be similar assessment and/or clean-up procedures. If the district court finally determines that Menza is liable for some or all of the environmental assessment and clean-up costs, he should bear that burden only once and not twice. Accordingly, we vacate the amount of restitution ordered and remand this issue to the district court with instructions to hold an evidentiary hearing to examine the specific allocation of costs more precisely and to determine: (1) whether the losses incurred by the DEA and Meriter are authorized recoverable costs under the VWPA and may be recovered in the form of restitution; and (2) whether the losses incurred by the DEA and Meriter are specifically attributed to and directly related to Menza's criminal conduct charged in the information only.

Menza's final argument is that the district court also abused its discretion in determining that he has the ability to pay restitution

---

**2.** The VWPA was first enacted in 1982 in an effort to afford greater protection to victims and witnesses, and to enhance their stature in the criminal justice system. *United States v. Gibbens*, 25 F.3d 28, 34 (1st Cir.1994) (citing S.Rep. No. 532, 97th Cong., 2nd Sess. 30, *reprinted in* 1982 U.S.C.C.A.N. 2515–16). Its purpose was to help "restore the victim to his or her prior state of well-being," and the prototypical victim to be afforded this protection was the private individual. *Id.* at 34 (citing 1982 U.S.C.C.A.N. at 2536).

to his victims. Defense counsel challenges this requirement that Menza pay restitution based upon the argument that the amount he is required to pay is well beyond his means and ability to satisfy the payment schedule set by the district court, and given his individual circumstance, full payment of the restitution ordered by the district court is impossible. The government asserts that district court properly considered Menza's ability and earning potential to pay restitution, determined that he has the means and earning potential, and within its proper discretion, ordered him to pay $15,830.42 in restitution.

 Under the VWPA, the district court must consider the defendant's *ability* to pay and not whether he can pay. *United States v. Viemont*, 91 F.3d 946, 951 (7th Cir.1996) (emphasis added); *United States v. Ahmad*, 2 F.3d 245, 247 (7th Cir.1993). The VWPA requires the district judge "to balance the victim's interest in compensation against the financial resources and circumstances of the defendant—all while remaining faithful to the usual rehabilitative, deterrent, retributive, and restrictive goals of criminal sentencing." *United States v. Lampien*, 89 F.3d 1316, 1323 (7th Cir.1996) (citing *United States v. Mahoney*, 859 F.2d 47, 49 (7th Cir.1988) (quoting *United States v. Bruchey*, 810 F.2d 456, 458 (4th Cir.1987)) (internal quotations omitted)).

In reviewing the record, we are confident that the district court in fact did consider Menza's ability to pay restitution and, along with consideration of the traditional goals of sentencing, properly concluded that he has the means and earning potential to pay restitution, both while in prison and after his release. There is no indication that the district court abused its discretion in its determination that Menza has the ability to compensate his victims for the losses they suffered, and if it becomes clear in the future that the defendant is having difficulty satisfying the monthly installment payment schedule, he may petition the district court to modify its restitution order. *See Viemont,* 91 F.3d at 950–52; *United States v. Johnson–Wilder*, 29 F.3d 1100, 1106 (7th Cir. 1994).

## Conclusion

For the foregoing reasons, we AFFIRM the district court's determination that Menza has the ability and earning potential to pay restitution, but VACATE the actual amount of restitution he was ordered to pay and REMAND that issue to the district court for the limited purpose of conducting an evidentiary hearing consistent with this opinion.