**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James E. WELLS, Defendant–Appellant.**

**No. 94–2695.**

United States Court of Appeals, Seventh Circuit.

Argued May 26, 1998.

Decided April 23, 1999.

James I. Marcus (argued), Williams & Marcus, Chicago, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, BAUER and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

In 1980, Defendant–Appellant James Wells ("Wells") hired an arsonist to torch one of Wells' businesses. Thereafter, Wells filed a claim with, and collected funds from, his insurance company. Ten years later, Wells became Chairman of the Board and Chief Executive Officer of Cosmopolitan National Bank in Chicago ("CNB"), at which time he proceeded to divert bank funds to build a restaurant which he owned. During his reign as CEO, Wells also bribed the then Illinois State Treasurer to conduct more business with the bank.

An FBI investigation followed, and on April 22, 1993, Wells pleaded guilty to a four-count superseding information pursuant to a written plea agreement, pleading guilty to: bribery (Count One); bank fraud (Count Two); arson (Count Three); and tax evasion (Count Four). The district court sentenced Wells concurrently to a 78-month term of imprisonment on Counts One, Two and Four, and a fifteen year term of imprisonment on Count Three, with all periods of confinement to run concurrently with each other. In addition, the judge ordered Wells to pay restitution: $1.5 million to Crum & Forster, an insurance company he defrauded (ordered on Count Three: arson) and $141,000 to the FDIC which he also defrauded (ordered on Count Two: bank fraud). On appeal, Wells challenges the validity of the district court's orders of restitution. We AFFIRM.

## I. BACKGROUND

From 1986 until 1990, James E. Wells was Chairman of the Board and Chief Executive Officer of CNB, a federally chartered bank insured by the FDIC. In

Matthew R. Bettenhausen, David A. Glockner (argued) Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Division, Chicago, IL, for Plaintiff–Appellee.

the early 1990's, the FBI conducted an investigation into Wells' questionable financial activity while he was at the helm of CNB. On April 15, 1992, a federal grand jury returned an indictment against Wells charging him with a total of fourteen counts including bribery, bank fraud, passport fraud, tax evasion, false statements on tax returns and illegal structuring of cash transactions. On September 16, 1992, a superseding indictment charged Wells with mail fraud. Finally, on April 22, 1993, the government filed a four-count superseding information against Wells. The information alleged violations of 18 U.S.C. § 666 (bribery); 18 U.S.C. § 1344 (bank fraud); 18 U.S.C. § 844(i) (arson); and 26 U.S.C. § 7201 (tax evasion).

Also on April 22, 1993, Wells entered a guilty plea to the four-count superseding information pursuant to a written plea agreement ("the Plea Agreement"). Wells admitted in the Plea Agreement that from 1987–1989, acting in his official capacity as CEO of CNB, he granted more than $2.3 million in loans and overdraft credit to an unqualified trucking company owned by the then Illinois State Treasurer Jerome Cosentino. Wells admitted that he extended credit to Cosentino's unqualified company in hopes of inducing Cosentino to deposit and maintain substantial Illinois state funds at CNB. In fact, CNB went from zero state deposits prior to May of 1987, to having $23 million in state deposits in May of 1989.

Wells also acknowledged in his written plea agreement that in 1989–1990, he defrauded CNB of approximately $141,000 by diverting bank funds from the construction of a CNB branch bank at 1400 North Lake Shore Drive in Chicago to the construction of an adjoining restaurant owned by Wells. Wells convinced the CNB Board of Directors to build a CNB branch bank next door to a building owned by

him, and also arranged for his own construction company, known as Wells Construction Co., to serve as the general contractor for the bank branch. Wells jointly oversaw the construction of the branch bank and the restaurant facility, and directed the construction company to bill CNB for work performed not only on the branch bank, but also on Wells' restaurant. In furtherance of this fraudulent scheme, Wells failed to disclose to the CNB Board that he was using bank construction funds to build and furnish his restaurant. The CNB, which was insured by the FDIC, ended up paying approximately $141,000 for work performed on the restaurant.

Wells further admitted in the plea to the allegations contained in Count Three of the superseding information filed in April of 1993, and acknowledged that in November of 1979, he and a partner purchased a five-story warehouse in Chicago for $18,-000, formed two business enterprises that operated out of the warehouse, and insured the building and business enterprises with Crum & Forster. In 1980, the defendant Wells hired an arsonist to torch the building, and thereafter filed arson insurance claims arising out of the fire. The insurance company eventually paid Wells $2,789,078 under the policies.[1]

Finally, Wells admitted that in 1987, 1988, and 1989, he concealed income totaling more than $120,000 from the Internal Revenue Service. Wells directed the bookkeeper of another one of his companies, The Wells Co., to write checks payable to fictitious vendors. Wells in turn cashed these checks at CNB and used the funds for personal purposes, while deducting the checks as business expenses on the Wells Co.'s corporate income tax returns.

In addition to detailing the facts surrounding Wells' crimes, the Plea Agreement set forth that Wells could be ordered

---

1. At Wells' sentencing hearing, a Chicago Fire Department officer testified that the fire was "an extremely large fire with a tremendous amount of heat that subjected our people and equipment to very, very severe conditions." In fact, the fire was so intense that it melted the windshield of one of the fire trucks at the scene, totally destroyed another piece of firefighting equipment, and more importantly, injured seven firefighters.

to pay restitution of up to $2,789,078 to Crum & Forster Insurance Company (on the arson count) and $141,980 to the FDIC (on the bank fraud count). Finally, the Agreement stated that Wells' total prison sentence on all counts would not exceed twenty years, and the government in turn would dismiss all counts charged in the superseding indictment.[2]

On June 24, 1994, the court held a sentencing hearing and sentenced Wells to 78 months imprisonment on Counts One, Two and Four pursuant to the United States Sentencing Guidelines ("USSG"). The court added 15 years imprisonment on Count Three (which was not governed by the USSG because the arson offense was committed in 1980)[3], to be served concurrently to the 78–month sentence on Counts One, Two and Four. The court further ordered Wells to serve two years of supervised release to commence upon his release from confinement. Finally, the court directed that Wells pay restitution in the amount of $141,000 to the FDIC, as receiver to CNB (on Count Two (bank fraud)), and restitution in the amount of $1,500,000 to Crum & Forster (on Count Four (arson)). On appeal, Wells challenges the district court's order that Wells pay restitution in the amount of $1.5 million to Crum & Forster as well as the order to pay restitution in the amount of $141,000 to the FDIC.

## II. ISSUES

(1) Did the district court have authority to order Wells to pay restitution to Crum & Forster based upon language set forth in the Plea Agreement; and

(2) Did the trial judge fail to consider Wells' ability to pay restitution to the FDIC and thereby abuse his discretion when he ordered Wells to make such payments?

## III. DISCUSSION

A. *Did the district court have authority to order Wells to pay restitution to Crum & Forster based upon language set forth in the Plea Agreement?*

In imposing its sentence on Count Three (arson), the district court ordered Wells to pay restitution in the amount of $1.5 million to Crum & Forster, even though the court failed to order probation on the arson count.[4] Wells alleges that "[t]he law in effect at the time Wells committed the [arson in 1980] provided that restitution could only be ordered in cases where there was a sentence of probation." Wells argues that since the sentence on the arson count failed to recite a term of probation, the court lacked authority to order restitution on Count Three, and the restitution order is thus improper and should be vacated.

The government counters that the order of restitution was permissible under 18 U.S.C. § 3663(a)(3), which admittedly had not been enacted and thus was not in effect in 1980 (the date of the arson), but *was* enacted and was in effect in 1993 and 1994, when Wells pleaded guilty, entered into the Plea Agreement, and was sentenced. Section 3663(a)(3) authorizes a

---

2. According to the April 22, 1993, hearing transcript, wherein Wells pleaded guilty to the four counts described in the Plea Agreement, the court acknowledged the parties' agreement that after Wells pleaded guilty and was sentenced, the original indictment would be dismissed. In addition, the June 24, 1994, judgment orders that "all counts contained in both the original and superseding indictments are dismissed on the motion of the United States."

3. The USSG applies to crimes committed after November 1, 1987, the effective date of the sentencing guidelines and the Sentencing Reform Act of 1984. *See United States v. Sims,* 144 F.3d 1082, 1083 (7th Cir.1998).

4. We note that the district court did sentence Wells to a term of "supervised release," which is essentially the modern day phraseology for "probation." However, it appears the term of supervised release was ordered on Counts One, Two and Four, and not on Count Three.

district court "to order restitution in any criminal case to the extent agreed to by the parties in a plea agreement." Wells expressly agreed in his Plea Agreement that "the amount of restitution which defendant could be ordered to pay to the Crum & Forster Insurance Companies, if able, is $2,789,078." As such, Wells explicitly agreed in his written Plea Agreement to be bound by the district court's restitution order, and the restitution order is valid. Wells retorts by claiming that if § 3663 is applicable to his case, then it constitutes an impermissible *ex post facto* law and thus its application to his case is improper.

Undoubtedly, "[a] federal court has no *inherent* authority to order restitution in a criminal case; it may do so only as expressly provided by statute." *United States v. Lampien*, 89 F.3d 1316, 1322 (7th Cir.1996) (quoting *United States v. Gilberg*, 75 F.3d 15, 22 (1st Cir.1996)) (emphasis added). "In fashioning a restitution order, a district court is therefore circumscribed by the substantive and procedural limitations outlined in the [governing statute.]" *Id.* (citations omitted). Moreover, because the authority to order restitution is created by statute, in the absence of statutory authority the parties may not manufacture it through a plea agreement. *See, e.g., United States v. Bennett*, 943 F.2d 738, 739 (7th Cir.1991) (district court could not exceed the sentencing authority of the Victim and Witness Protection Act based upon a plea agreement alone). Whether the district court had the statutory authority to order restitution is a question of law which we review *de novo. See, e.g., United States v. Holloway*, 991 F.2d 370, 372 (7th Cir.1993) (questions of law relating to a sentencing decision are reviewed *de novo*) (citation omitted).

The initial question presented is whether § 3663(a)(3) applies to a defen-

dant who committed a crime in 1980, but entered into and signed a written plea agreement in 1993 and was sentenced in 1994. Wells alleges that on the date of the crime (in 1980), the relevant statutory sentencing authority was the Federal Probation Act ("FPA"), 18 U.S.C. § 3651 (repealed effective November 1, 1987). Under the FPA, restitution could be ordered only "while [the defendant is] on probation and among the conditions thereof." 18 U.S.C. § 3651. This language permitted restitution only as a condition of probation. *See United States v. Snider*, 957 F.2d 703, 706 (9th Cir.1992). Because the 15–year sentence imposed upon Wells on the arson count failed to recite a term of probation, Wells alleges that the FPA is not viable statutory authority for the restitution order, and thus the order must be vacated.

We disagree with Wells' argument that the FPA is the only potentially applicable statute. The Victim Wellness and Protection Act ("VWPA") amended Title 18 by providing that "[t]he court, when sentencing a defendant convicted of an offense under [Title 18] ... may order ... that the defendant make restitution to any victim of the offense." 18 U.S.C. § 3579(a).[5] However, Wells points out that Congress directed that this provision as originally enacted only applied to offenses occurring on or after January 1, 1983, and since the arson offense was committed in 1980, the former § 3579(a) of the VWPA does not authorize the district court to impose restitution on his sentence.

In 1990, the Crime Control Act of 1990 amended the VWPA by, among other things, adding subparagraph (3) to 18 U.S.C. § 3663(a). That subparagraph states in relevant part that "[t]he court may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement." 18 U.S.C. § 3663(a)(3); Pub.L. 101–647, 104 Stat. 4863 (1990).[6] The amendment was part of

5. The VWPA was originally codified at 18 U.S.C. §§ 3579–3580. It was redesignated at

18 U.S.C. §§ 3663–3664 as part of the Sentencing Reform Act of 1984.

6. When this amendment became effective,

the law at the time Wells pleaded guilty (1993), entered into his Plea Agreement (1993), and was sentenced (1994), all of which occurred after 1990. The provisions in effect at the time of the defendant's sentencing may constitute proper authority for the court's sentencing decisions. *See United States v. Rice,* 954 F.2d 40, 44 (2nd Cir.1992) (even though § 3663(a)(3) was not effective at the time the district court entered judgment against defendant, court could nevertheless rely on that particular provision because it became effective prior to defendant's sentencing hearing); *United States v. Hughey,* 877 F.2d 1256, 1258, n. 2 (5th Cir.1989) (court applies version of restitution statute in effect at time of sentencing), *reversed on other grounds,* 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990). Because § 3663(a)(3) was part of the governing law at the time of Wells' sentencing, that section is applicable to Wells' case, and based on its clear language, we are of the opinion that the district court was statutorily authorized to order restitution to the extent agreed to by Wells in his Plea Agreement.

■ The language used in the Plea Agreement reads as follows: "Regarding restitution, the parties agree that the amount of restitution which defendant could be ordered to pay to the Crum & Forster Insurance Companies, if able, is $2,789,078." Later in the Agreement, Wells acknowledges that before signing he "read [the] Plea Agreement and carefully reviewed each provision with his attorney" and that he "understands and voluntarily accepts each and every term and condition of [the] Plea Agreement." Obviously, Wells, upon reading, approving and signing the Plea Agreement, agreed that he could be ordered to repay a maximum amount of $2,789,078.

Moreover, Wells' own testimony at his plea hearing supports our belief that Wells knew full well what he was agreeing to,

Congress did not circumscribe application of the amendment to those offenses occurring

and belies his argument against paying restitution. At the plea hearing, the following colloquy occurred between the court and an Assistant United States Attorney ("AUSA"):

THE COURT: Now, is restitution a part of this?

AUSA: Your honor, what the plea agreement would provide with respect to restitution is that Mr. Wells is liable up to the amount specified in the plea agreement.

THE COURT: Which is what?

AUSA: $2,789,078 to the Crum & Forster Insurance Co. and $141,980 to the [FDIC], as receiver of [CNB]. But the plea agreement also provides that that is, simply, an agreement as to the maximum that he would be liable for.

THE COURT: Do you understand, Mr. Wells, that as part of the sentence the Court can order restitution?

DEFENDANT: Yes.

Wells signed the written Plea Agreement, and did not object to the AUSA's oral representations detailing the Plea Agreement. In fact, when queried at the hearing, he explicitly agreed that the court had authority to order restitution in an amount of $2,789,078. (The judge actually awarded $1.5 million.) Simply put, § 3663 permitted the sentencing judge to order that Wells pay restitution in the amount of $2,789,078 to Crum & Forster as agreed to in the Plea Agreement. In return for certain promises bargained for from the government as set forth in the Plea Agreement, including dismissal of the original and superseding indictments, Wells expressly agreed in clear and unambiguous language that the trial court had the authority and jurisdiction to order him to compensate his victims within the parameters of the Agreement. The trial court did just that, and Wells cannot now be heard to complain.

after November 29, 1990.

■ Finally, we reject any argument that application of § 3663 operates as an *ex post facto* law in this case. The Ex Post Facto Clause of the Constitution prohibits the retroactive application of a criminal law that prejudices a defendant. See U.S. CONST. art. I, sec. 9, cl.3. Application of a statute violates the Ex Post Facto Clause if it (1) criminalizes conduct that was legal when done; (2) imparts greater punishment for an offense than that which existed at the time the offense was committed; or (3) eliminates a defense available under the law that was in effect at the time the offense was committed. *See United States v. Black,* 125 F.3d 454, 466 (7th Cir.1997). Using § 3663 as the basis for permitting the Plea Agreement, and thus authorizing restitution, does not violate the Ex Post Facto Clause for two reasons. Initially, this Circuit does not treat restitution as criminal punishment in the first place, because restitution has traditionally been "viewed as an equitable device for restoring victims to the position they had occupied prior to a wrongdoer's actions." *See United States v. Szarwark,* 168 F.3d 993, 998 (7th Cir.1999) (citing *United States v. Newman,* 144 F.3d 531, 538 (7th Cir.1998)). Stated more strongly, "[r]estitution is not 'punishment' within the meaning of the Ex Post Facto Clause." *Id.; Newman,* 144 F.3d at 538 (quoting *Black,* 125 F.3d at 467). As such, a change in the law of restitution fails even to implicate the Ex Post Facto Clause.

Secondly, application of § 3663, which authorizes the trial court to order restitution if the defendant agreed to it in a plea agreement, does not disadvantage defendants by "increas[ing] the punishment" for the charged crime. Under § 3663, the government may offer a plea agreement requiring the defendant to pay restitution. It is well known that a defendant will only enter such a plea agreement if he or she believes the terms are favorable to him or her and if the defendant opts to pay restitution rather than giving up something else (such as dismissing other counts charged in the indictment or accepting a longer term of imprisonment). It follows that § 3663 simply permitted Wells another option in the plea agreement process, an option that he was free to ignore if he so chose. Instead, he took advantage of the option and agreed to pay restitution in return for concessions from the government. A defendant is made better off, not worse off, when he or she has the option, at the defendant's discretion, of agreeing to pay restitution as part of the agreement. As such, the application of § 3663 cannot be characterized as an unconstitutional *ex post facto* law.[7]

B. *Did the trial judge fail to consider Wells' ability to pay restitution to the FDIC and thereby abuse his discretion when he ordered Wells to make such payments?*

Wells next complains that the order to pay $141,000 in restitution to the FDIC (on the bank fraud count) should likewise be vacated. He admits that the trial court had statutory *authority* to order restitution because the offense occurred, and the sentences were imposed, after 1993, and thus restitution is authorized by the VWPA. However, Wells alleges that the district judge *misapplied* the statute by failing to adequately consider the specific factors listed below and set forth at 18 U.S.C. § 3663(a)(1)(B)(i), which states that:

> The court, in determining whether to order restitution under this section, shall consider—

---

7. We note that the government also argued that Wells waived his right to appeal the restitution order because Wells "failed to object to the imposition of such an order at any point during the proceedings below." However, the sentencing hearing transcript reveals that the judge and Wells' attorney, in the presence of the defendant, engaged in a substantial colloquy dealing with the propriety of restitution generally. As such, we address the merits of Wells' claims.

(I) the amount of the loss sustained by each victim as a result of the offense; and

(II) the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.

Specifically, Wells contends that because of his poor health he will lack the earning ability to pay restitution, and that the sentencing judge failed to take Wells' health problems into account when he ordered that restitution of $141,000 be paid to the FDIC.

 District court judges enjoy broad discretion in ordering restitution. *See United States v. Ross*, 77 F.3d 1525, 1552 (7th Cir.1996) (citing *United States v. Loscalzo*, 18 F.3d 374, 386 (7th Cir.1994)). An order of restitution will not be vacated upon review unless the defendant demonstrates that the district court abused this discretion in determining that restitution was appropriate or in setting the amount to be paid. *Id.* And, a restitution order will be reversed if the defendant shows "either that (1) the district court repudiated a mandatory factor, or (2) that it was 'not improbable' that the judge failed to consider a mandatory factor and was influenced thereby." *United States v. Viemont*, 91 F.3d 946, 951 (7th Cir.1996) (citations omitted). Wells bears the burden to demonstrate his lack of financial resources and ability to pay. *See id.* at 950.

 Wells contends that because of his poor health he will be unable to pay restitution. While the health of a defendant is not a specifically enumerated consideration in the statute, our Circuit has reviewed questions raised regarding a defendant's alleged poor health when determining whether or not that individual has the "ability to pay," a factor which *is* enumerated in the statute. *See, e.g., United States v. Lesperance*, 25 F.3d 553, 558 (7th Cir.1994) ("district court complied with its obligation to consider the mandatory fac-

tors" when it demonstrated an awareness of defendant's health problems prior to ordering restitution); *Lampien*, 89 F.3d at 1323 (court considered severe asthma, high blood pressure, arthritis, and severe emotional problems to determine whether defendant was capable of earning income and paying restitution).

Our review of the record reveals that the trial judge considered the relevant mandatory factors, including Wells' ability to earn income in light of his alleged health problems. At Wells' sentencing hearing, Wells was permitted to call his doctor to testify in detail about Wells' medical problems, including among other things, his diabetes. The sentencing judge heard the doctor's testimony and also acknowledged Wells' attorney's characterization of the defendant as "totally disabled." Later, the sentencing judge acknowledged that Wells suffered from physical problems. Thus, based upon a thorough review of the record, we are convinced that it is obvious that the trial court considered the defendant's health problems.

 Furthermore, the trial judge analyzed other factors enumerated in § 3663. For instance, it is well established that under § 3663, the sentencing judge may order restitution "if there is some likelihood that [the defendant] will acquire sufficient resources in the future." *Viemont*, 91 F.3d at 951 (citation omitted). Moreover, in assessing the likelihood a defendant will be able to make restitution, the court may consider the defendant's entrepreneurial talents. *See United States v. Clemmons*, 48 F.3d 1020, 1023–24 (7th Cir. 1995) (defendant's ingenuity and capabilities demonstrated in concocting fraudulent scheme show potential to pay restitution), *overruled on other grounds by United States v. Allender*, 62 F.3d 909 (7th Cir. 1995).

 At Wells' sentencing hearing, Wells' probation officer advised the court that it was somewhat difficult to conceive how Wells could currently be without as-

sets, yet have owned two businesses, received more that $300,000 in income in 1989, not filed tax returns in 1990–1992, and had $105,000 cash in his possession when he was arrested attempting to flee the country. When pronouncing the sentence, the trial judge stated: "It may be that [Wells] has nothing. I am not, however, based upon what I understand is Mr. Wells' knowledge of banking and financial matters, able to arrive at a comfortable conclusion that his economic circumstances are such that he cannot make proper restitution. So, I am going to order restitution [of] $141,000 to the FDIC."

The record, in its entirety, reveals that the district judge made such a finding after considering all available evidence regarding Wells' ability to pay, as presented by the government, the defendant, and the probation office. It is undisputed that Wells had a substantial income as a bank CEO before the disclosure of his fraudulent conduct, and he displayed considerable misguided ingenuity in concocting the various frauds that have landed him in his present situation. Under these circumstances, we agree with the district court's conclusion that despite Wells' health problems, there is a sufficient likelihood that Wells will generate sufficient income in the future to pay the restitution. As we have stated previously, even if there were some doubt about ability to pay, the court should order full restitution. *United States v. Ahmad*, 2 F.3d 245, 247 (7th Cir.1993). As such, we are convinced that the district court acted well within its discretion in requiring Wells to return to the FDIC his illgotten gain.

■ One final point requires discussion. The district court's order requiring restitution states that the schedule of restitution payments is "to be determined by [the] probation [office.]" In *United States v. Yahne*, 64 F.3d 1091 (7th Cir.1995), we addressed the issue of whether the district court can delegate (to the probation office) the task of establishing a payment schedule. In *Yahne*, the district court erred in ordering the probation department to schedule the defendant's restitution installment payments. On appeal, both parties agreed that the district court erred in delegating the duty to establish a payment schedule to the probation department. We agreed, and cited *United States v. Murphy*, 28 F.3d 38, 39–42 (7th Cir.1994), wherein we held that "18 U.S.C. § 3663 does not permit a district judge to delegate to the administrative staff the specification of a payment schedule." *Yahne*, 64 F.3d at 1097 (citing *Murphy*, 28 F.3d at 42 (citation omitted)). We remand this case to the district court for the limited purpose of setting a specific payment schedule dealing with the orders of restitution.

## IV. CONCLUSION

We AFFIRM the district court in all respects except we REMAND the case with instructions that the presiding judge set a specific payment schedule for the orders of restitution.